UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 19-CR-10278-RWZ

UNITED STATES OF AMERICA

v.

JASON JIMENEZ

MEMORANDUM & ORDER

May 22, 2020

Zobel, S.D.J.

Defendant Jason Jimenez moves to suppress his statements and the evidence collected by law enforcement during an automobile stop and subsequent searches on July 10, 2019. Following an evidentiary hearing and arguments of counsel, the motion (Docket # 35) is allowed in part and denied in part.

I. **Findings of Fact**

Mr. Jimenez stands accused in one count of possession with intent to distribute over 40 grams of fentanyl, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), after law enforcement officers found in his underwear a package of what appeared to be drugs. FBI Supervisory Special Agent ("SSA") Gary Cacace and Lawrence Police Detective Radames Gonzalez testified at the hearing on defendant's motion regarding the events that led to defendant's arrest. They were surveilling Portland Street, which was known to them as an area used for considerable drug activity because of its remote location next to the train tracks. The officers, sitting in an unmarked Honda Accord, observed

1

Mr. Jimenez in the driver's seat of an idling compact Kia, which, they learned, was registered to a car rental agency they understood to be used by drug traffickers. Soon thereafter, a pedestrian, who openly carried a pack of money in his hand, walked up to the Kia, entered and sat in the front passenger seat. Mr. Jimenez drove the car three tenths of a mile, took four turns along the way, and dropped the pedestrian-turned-passenger on nearby Salem Street. The passenger went directly to a waiting Buick, which drove away. The officers never stopped the Buick, nor recorded its registration number, and they did not ascertain the identity of the man they had seen enter it.

After the defendant dropped off his passenger on Salem Street, he drove away. Detective Gonzalez and SSA Cacace followed. Gonzalez testified that, while behind the Kia, he could see the driver looking in the rear- and side-view mirrors. The officers followed defendant for at least two minutes before Detective Gonzalez decided to stop the car. After he had turned on the lights, he saw the defendant shifting and moving his shoulders up and down.

When the Kia stopped, the officers pulled over in front of defendant's car and approached it on both sides. Detective Gonzalez, on the driver's side, acknowledged at the hearing that he did not, at that point, have sufficient evidence to sustain an arrest.

When the driver-side door was opened, Detective Gonzalez read Mr. Jimenez his Miranda rights from a standard-issue Lawrence Police Department card. It is apparently the practice of the drug unit to read suspects their rights immediately upon engaging.

Detective Gonzalez told Mr. Jimenez that he had been seen picking somebody up, driving for a short distance, then dropping that person off. At first, the defendant denied having any passenger in the car, but he subsequently admitted to giving

someone a ride.  At one point he also said that he came from a Wal-Mart and later that he had given someone a ride to the train station.  Detective Gonzalez noted that the defendant kept moving his right arm between his legs and ordered him out of the car. The officers saw two phones in the passenger cabin, which, according to the testimony, is typical for someone dealing drugs.

    The officers decided to conduct a pat frisk for weapons, in part because SSA Cacace recalled that another law enforcement operation in the area had purchased numerous guns from drug traffickers.

    Detective Gonzalez testified that he conducted two searches which he characterized as pat frisks.  During the first one, he found a lip balm and felt a "hard object" in Mr. Jimenez's pants, which object he believed to be drugs.  His testimony confirms that he did not believe the object was a weapon of any kind:

> DEFENSE COUNSEL: At no time, whether it was in your first pat frisk or your second pat frisk, did you feel anything that indicated to you that it was a firearm, a gun?
> DETECTIVE: No . . . .
> DEFENSE COUNSEL: During your two pat-downs, you didn't feel anything which indicated to you was a weapon?
> DETECTIVE: All I felt was a lip balm and then the other object.
> DEFENSE COUNSEL: Right.  And the other object which you described, as you were patting this person in his groin area, I think your testimony was that you felt an object that was weird, that was out of place, and that was an odd object.  Is that what your testimony was?
> DETECTIVE: Yes.
> DEFENSE COUNSEL: So not a gun, not a knife, but an odd object, correct?
> DETECTIVE: Correct.

Nevertheless, Detective Gonzalez decided to conduct a second search. When he went towards the hard object, the defendant pulled his hips away from the Detective. At that point, Detective Gonzalez accused Mr. Jimenez of selling drugs, to which the defendant responded "it is what it is," or as SSA Cacace described, "something along [those] lines." Detective Mike Reardon, having arrived as backup, then undid the defendant's pants, inserted his gloved hand into Mr. Jimenez's underwear and retrieved a baseball-sized package of what appeared to be drugs. Defense counsel again questioned Detective Gonzalez about Detective Reardon's search at the hearing:

> DEFENSE COUNSEL: The purpose of reaching into the underwear was to pull out whatever you believed was a weird object, right?
> DETECTIVE: Yes.
> DEFENSE COUNSEL: And the weird object certainly was not a gun or a knife?
> DETECTIVE: It was illegal contraband.
> DEFENSE COUNSEL: It was drugs?
> DETECTIVE: Yes, after the statement was made.
> DEFENSE COUNSEL: It was a search for evidence, correct?
> DETECTIVE: Yes.

After this discovery, Mr. Jimenez was arrested.

I credit the testimony that in none of the three pat frisks did the officers find a weapon and that the target of Detective Reardon's search was not a weapon, but illegal drugs.

## II. The Fourth Amendment Issues

### a. Legal Standard

The Fourth Amendment protects against warrantless searches and seizures, but for a few limited exceptions, Katz v. United States, 389 U.S. 347, 357 (1967), which include an investigatory stop and frisk under Terry v. Ohio, 392 U.S. 1, 30 (1968). An

4

officer may conduct such a stop "when he or she has a reasonable, articulable suspicion that criminal activity is afoot." United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005) (citing Terry, 392 U.S. at 30); United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)).  Reasonable suspicion must be based on an objective analysis of "specific and articulable facts." United States v. Hensley, 469 U.S. 221, 226, 233–34 (1984). "[A] court looks at the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion." McKoy, 428 F.3d at 39.  These "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." United States v. Stanley, 915 F.2d 54, 56 (1st Cir. 1990).  When officers stop a person in his car for an investigatory stop, they are permitted to order the driver to exit the car. Pennsylvania v. Mimms, 434 U.S. 106, 108 (1977).

After a valid investigatory stop, the officer may also conduct a pat frisk for weapons if he "is justified in believing the person is armed and dangerous to the officer or others." Romain, 393 F.3d at 71 (quoting United States v. Schiavo, 29 F.3d 6, 8 (1st Cir. 1994)).  However, the justification for the pat frisk must be analyzed separately from the justification for the stop itself, McKoy, 428 F.3d at 39, and must be based on the perceptions of the officers in the field themselves, United States v. Lott, 870 F.2d 778, 783–84 (1st Cir. 1989).  The limited purpose of the search is to find weapons, not evidence. Adams v. Williams, 407 U.S. 143, 146 (1972); see also Ybarra v. Illinois, 444 U.S. 85, 93–94 (1979) ("Nothing in Terry can be understood to allow a generalized cursory search for weapons or, indeed, any search whatever for anything but weapons.") (citing Terry, 392 U.S. 1).

5

### b. Discussion[1]

The officers' conduct was constitutional up to and including the first pat frisk of Mr. Jimenez. They had reasonable suspicion to stop him because Portland Street was a known high-drug-crime area; he was driving a rental car, which, as testified, is a known practice of people trafficking drugs; a person carrying cash entered his car; and he gave that passenger a meaningless ride to nowhere of three tenths of a mile.

Furthermore, defendant's actions and the officers' observation and knowledge of the milieu fully justified an initial Terry frisk. These included defendant's repeatedly moving his hand to his groin while talking to Detective Gonzalez and SSA Cacace's knowledge that drug traffickers often carry weapons and that guns were part of the drug trade in this particular neighborhood. Thus, they had grounds to frisk Mr. Jimenez for weapons.

However, the searches beyond that initial frisk are problematic. The Supreme Court has been "careful to maintain" the "narrow scope" of the Terry exception to the requirement of probable cause. Ybarra, 444 U.S. at 93 (citing Dunaway v. New York, 442 U.S. 200, 210 (1979)). A patdown search, while brief, is a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." Terry, 392 U.S. at 17. By his second pat down, Detective Gonzalez had no further reason to believe Mr. Jimenez was armed and dangerous, which he made very clear at the hearing. He repeatedly stated that he

---

[1] Defense counsel provided the court with a copy of the Supreme Judicial Court's recent decision in Commonwealth v. Torres-Pagan regarding pat frisks during a roadside stop. No. SJC-12697 (Mass. Jan. 29, 2020). While enlightening, that case has no bearing on my reasoning here.

did not believe the second object he felt was a weapon; instead, he believed it to be drugs. But the search for evidence falls squarely outside of Terry's limited search for weapons. See Sibron v. New York, 392 U.S. 40, 65–66 (1968); Lott, 870 F.2d at 785 (search was "fatally undercut" because it "was directed towards finding contraband" in addition to weapons).

It is especially troubling that these searches took place in and around defendant's groin and in his underpants. A Terry frisk is limited in purpose and thus should be as uninvasive as possible. Compare Sibron, 392 U.S. at 65 (deploring "with no attempt at an initial limited exploration for arms, [the officer] thrust his hand into [defendant's] pocket and took from him envelopes of heroin"), with Terry, 392 U.S. 1 (endorsing that officer did not place his hands in pockets or under outer surface of garments until he had felt weapons, and then merely reached for and removed guns). Where the search involves fishing around in the most intimate areas of a person's body, particular restraint is warranted. That restraint was absent in this case.

### i. Inevitable Discovery

Citing the principle of inevitable discovery, the government claims that the searches' unconstitutionality is neutralized because the officers had probable cause to arrest Mr. Jimenez before the searches or, at least, independent of the searches. They argue the officers were inevitably and justifiably going to arrest Mr. Jimenez and thus the drugs would have been discovered as a search incident to arrest (another exception to the warrant requirement). See Chimel v. California, 395 U.S. 752, 762–73 (1969).

The inevitable discovery doctrine says that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received." Nix v. Williams, 467 U.S. 431, 445 (1984).  The standard has also been described as a "high probability that the evidence would have been discovered by lawful means." United States v. Rogers, 102 F.3d 641, 646 (1st Cir. 1996).  This high probability must be shown by reference to "demonstrated historical facts," not mere speculation.  United States v. Infante-Ruiz, 13 F.3d 498, 503 (1st Cir. 1994).  In this Circuit, the court divides the inevitable discovery analysis into three parts: "first, whether the legal means [of discovery] are truly independent; second, whether both the use of the legal means and the discovery by that means are truly inevitable; and, third, whether the application of the inevitable discovery exception either provides an incentive for police misconduct or significantly weakens fourth amendment protection." United States v. Scott, 270 F.3d 30, 42 (1st Cir. 2001) (quoting United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986).

Where, as here, an arrest is the legal means of discovery, it is considered independent if "(1) the police, in fact, would have arrested the defendant, even without first having discovered the challenged evidence, and (2) in the absence of the challenged evidence, the officers nevertheless had probable cause to make the arrest without the challenged evidence." United States v. Almeida, 434 F.3d 25, 28 (D. Mass 2006).  Although the existence of probable cause is an extremely close question, the government has in any event failed to prove that the officers would have arrested the defendant absent the third search.  Indeed, Detective Gonzalez testified he did not

8

believe they had grounds to arrest Mr. Jimenez when they stopped the car. The defendant was in fact arrested after Detective Reardon's search and his discovery of the package.

The government asserts inevitable discovery because drugs would have been found incident to an arrest, but the testimony of Detective Gonzalez was clear that he did not have cause to act until Detective Reardon had found the drugs.

### ii. Suppression

The exclusionary rule requires the suppression of evidence obtained as a result of an unlawful search or arrest. United States v. Bienvenue, 632 F.2d 910, 913 (1st Cir. 1980). Because all searches after the first pat frisk were unconstitutional, all evidence seized from those searches is suppressed, including the alleged narcotics and money found on Mr. Jimenez's person and any other fruits of those searches not heretofore named.

### III. The Miranda Issues

#### a. Legal Standard

Mr. Jimenez claims he was not provided his Miranda warnings when he was arrested. Prior to interrogation of a defendant who is in custody or otherwise deprived of his freedom of action in any significant way, he "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," if he cannot afford one. Miranda v. Arizona, 384 U.S. 436, 444 (1966). The government must show by a preponderance of the evidence that those warnings were given and any waiver of them was voluntary. Berghuis v. Thompkins, 560 US 370, 384 (2010).

### b. Discussion

Based on both officers' testimony, I find the defendant was Mirandized at the encounter's outset. Additionally, the explanations printed on the card Detective Gonzalez read are sufficient. As such, Mr. Jimenez's Miranda rights were not violated and none of his statements to the officers are suppressed.

## IV. Conclusion

Defendant's motion to suppress (Docket # 35) is GRANTED as to evidence seized pursuant to the unlawful searches but DENIED as to any statements he made to officers.

|  |  |
|---|---|
| May 22, 2020 | /s/ Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |