1                      UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                        )
4    UNITED STATES OF AMERICA,          )
                                        )
5              Plaintiff,               )
                                        )  Criminal Action
6    v.                                 )  No. 1:19-cr-10278-RWZ-1
                                        )
7    JASON JIMENEZ,                     )
                                        )
8              Defendant.               )
                                        )
9

10

11             BEFORE THE HONORABLE RYA W. ZOBEL
                  UNITED STATES DISTRICT JUDGE
12

13                      EVIDENTIARY HEARING

14

15                      January 8, 2020
                          9:01 a.m.
16

17          John J. Moakley United States Courthouse
                     Courtroom No. 12
18                  One Courthouse Way
                 Boston, Massachusetts 02210
19

20

21             Linda Walsh, RPR, CRR
                 Official Court Reporter
22     John J. Moakley United States Courthouse
               One Courthouse Way, Room 5205
23             Boston, Massachusetts 02210
                 lwalshsteno@gmail.com
24

25

```
 1    APPEARANCES:

 2    On Behalf of the Government:

 3          UNITED STATES ATTORNEY'S OFFICE
            By: Evan D. Panich, Esq.
 4          One Courthouse Way, Suite 9200
            Boston, Massachusetts 02210
 5          617-748-3652
            evan.panich@usdoj.gov
 6
      On Behalf of the Defendant:
 7
            JACKSON LEWIS PC
 8          By: Paul V. Kelly, Esq.
            75 Park Plaza, 4th Floor
 9          Boston, Massachusetts 02116
            617-367-0025
10          paul.kelly@jacksonlewis.com

11          JACKSON LEWIS, P.C.
            By: Carmen F. Francella, III, Esq.
12          10050 Regency Circle, Suite 400
            Omaha, Nebraska 68114
13          617-305-1271
            carmen.francella@jacksonlewis.com
14

15    ALSO PRESENT:  AUSA Timothy Moran
                     Jason Jimenez
16

17
                     Proceedings reported and produced
18                    by computer-aided stenography.

19

20

21

22

23

24

25
```

```
1                              INDEX

2    WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3    RADAMES GONZALEZ

4        By Mr. Panich            7                81
         By Mr. Kelly                     38
5
     GARY S. CACACE
6
         By Mr. Panich           84               128
7        By Mr. Kelly                     97

8    KEITH WEIDLICH

9        By Mr. Kelly           130

10                         E X H I B I T S

11                         DESCRIPTION              RECEIVED
     GOVERNMENT EXHIBITS
12
        1      ...........................................      12
13
        2      ...........................................      13
14
        3      ...........................................      23
15
        4      ...........................................      23
16
        5      ...........................................      23
17
        6      ...........................................      29
18
                           DESCRIPTION              RECEIVED
19   DEFENDANT EXHIBITS

20      A      ...........................................      39

21      B      ...........................................      42

22      C      ...........................................      48

23      D      ...........................................      57

24      E      ...........................................      59

25      F      ...........................................     106
```

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise, please.
 3            THE COURT:  Good morning.  Please be seated.
 4            THE CLERK:  This is United States versus Jason
 5    Jimenez, and it's Criminal 19-10278.
 6            Could I ask counsel to identify themselves, please.
 7            MR. PANICH:  Good morning, Your Honor.  Evan Panich
 8    for the United States.
 9            MR. MORAN:  Timothy Moran, Your Honor.  Good morning.
10            THE COURT:  I don't have you on my list.
11            MR. MORAN:  I'm just second chairing, Your Honor.
12            THE COURT:  You don't have an appearance in the case?
13            MR. MORAN:  I will.  I can, if you'd like.
14            THE COURT:  Well, I think so.
15            MR. MORAN:  Okay.
16            MR. KELLY:  Good morning, Your Honor.  Paul Kelly on
17    behalf of the defendant, along with my colleague, Carmen
18    Francella.  And Mr. Jason Jimenez is here with us at counsel
19    table, Your Honor.
20            THE COURT:  Okay.  So this is the defendant's motion
21    to suppress.  And, as I understand the papers, the issue is
22    what did the -- what did the agents, or whoever did this, know,
23    or what was the evidence concerning their knowledge of
24    Mr. Jimenez carrying drugs to allow them to rummage around his
25    crotch.
```

```
 1              MR. PANICH:  I'm not sure we put it quite that way,
 2       but I agree with your characterization, that it's the agent's
 3       knowledge that is relevant here.
 4              THE COURT:  And the government has the burden of
 5       proof.  So are you going to have witnesses?
 6              MR. PANICH:  Yes, Your Honor.
 7              Before we begin, I just want to address one
 8       administrative matter.  Special Agent Keith Wilder is the case
 9       agent on this case and is present in the courtroom.
09:02 10              THE COURT:  You want him at counsel table?
11              MR. PANICH:  I just want to make sure -- there's no
12       sequestration order, but I just want to imply to the Court that
13       he is likely to testify.  He will be testifying today.
14              THE COURT:  Was he one of the people there?
15              MR. PANICH:  Yes, he was on part of the team that
16       conducted the arrest last year.
17              MR. KELLY:  I think it's appropriate to have the
18       sequestration order in terms of not having the witnesses sit in
19       and listen to the other witnesses.  I think it's a fairer
09:03 20       approach to keep them separate.
21              MR. PANICH:  I don't object.  If Mr. Kelly would
22       like --
23              THE COURT:  Why don't you put him on as the first
24       witness?
25              MR. PANICH:  I don't think logically that necessarily
```

 1   makes sense.  He's going to be last, but it's fine for him to

 2   wait outside.

 3            THE COURT:  Okay.  That's what we'll do.

 4   Sequestration order is in effect.

 5            And who -- do counsel wish to make any opening

 6   statement?

 7            MR. PANICH:  No, Your Honor.  We're prepared to

 8   proceed without --

 9            THE COURT:  Okay.  So who is the first witness?

09:03 10            MR. PANICH:  It's Detective Radames Gonzalez of the

11   Lawrence Police Department.

12            THE CLERK:  You are going to go around that way, sir,

13   please.

14            THE COURT:  There's only one entrance to this.

15            THE CLERK:  I am going to swear you in, sir.

16            (Witness sworn.)

17            THE WITNESS:  I do.

18            THE CLERK:  Okay.  Sir, could I ask you to step in and

19   speak into the mic and state your name, spelling your last name

09:04 20   for the record, sir.

21            THE WITNESS:  My name is Radames Gonzalez, and my last

22   name is spelled G-o-n-z-a-l-e-z.

23            THE COURT:  Do you know Aida?

24            THE WITNESS:  I do not.

25            THE COURT:  You do not?  Nobody knows Aida?  You know

1    Aida, right?

2              MR. PANICH:  I didn't hear you, Your Honor.  Who is

3    it?

4              THE COURT:  The opera *Aida* has its other main

5    character, Radames, right?

6              MR. PANICH:  Mr. Kelly asked me that --

7              THE COURT:  But save you the terrible end that they

8    have.  Do you remember what the end is?

9              THE WITNESS:  I don't.

09:05 10            THE COURT:  They were locked into a cave with a big

11    rock in front of it because they were in love with each other,

12    and the king didn't like it.

13              We are not going to do anything of the sort.

14              THE WITNESS:  I hope not.

15              RADAMES GONZALEZ, having been duly sworn by the Clerk,

16    was examined and testified as follows:

17                         DIRECT EXAMINATION

18    BY MR. PANICH:

19    Q.   Against that backdrop, good morning, Detective Gonzalez.

09:05 20              How are you employed?

21    A.   I am employed by the City of Lawrence, the Lawrence Police

22    Department specifically.

23    Q.   And what is -- what do you do for the Lawrence Police

24    Department?

25    A.   Currently my position with the Lawrence Police Department

1    is a narcotics investigator.

2    Q.   And what is your rank with the Lawrence Police Department?

3    A.   I am a detective with the Lawrence Police Department.  And

4    just recently I was tasked out as a task force agent with the

5    FBI.

6    Q.   How long have you served as a detective with the Lawrence

7    Police Department?

8    A.   A little over five years.

9    Q.   And what experience do you have in investigating narcotics

09:06 10   offenses?

11   A.   Initially, at the academy level, there's a 40-hour block

12   on an introductory phase to do observing -- they expose you to

13   what drugs look like, some of the behaviors that come with it.

14   But a lot of the training and experience is gained with the

15   unit itself.

16   Q.   And how long have you been acquiring that experience

17   investigating narcotics offenses?

18   A.   It's always ongoing.  In my FTO, field training officer,

19   experience, I had the honor of being with the sergeant who is

09:07 20   pretty savvy with street-level narcotics.  So I did that for a

21   90-day period.  And then when I got on the drug unit, we've

22   gone to PACE to conferences, which is a Proactive Counter

23   Enforcement, and then just being trained by the guys who are

24   currently on the unit.

25   Q.   With respect to your experience, how long have you been

1    investigating those offenses?

2    A.    Still, currently for five years.  Our unit, primarily in

3    the first few years, we've made over 1,500 arrests that were

4    all drug related, specifically street-level crimes,

5    quality-of-life issues.

6    Q.    How many drug deals would you say you've observed in your

7    time in law enforcement?

8    A.    Physical, hand-to-hand transactions, I've experienced

9    probably over 100, received over 100 transactions, but there's

09:08 10   other ways that those transactions occur.  I've witnessed over

11   100 of those within my five years of experience.

12   Q.    What was your assignment on July 10th of last year?

13   A.    At that time we -- the police department was collaborating

14   with multiple agencies to do a sting, to put more of an

15   emphasis so that they could try to make an impact on

16   street-quality life issues.  They put a heavy emphasis on the

17   drug violation aspect of it.

18   Q.    Which agencies was the Lawrence Police Department working

19   with last summer?

09:09 20   A.    We had counter order initiative, Drug Enforcement Agency,

21   the FBI.  We also had Methuen, North Andover Police

22   Departments' drug units involved.

23   Q.    So describe, if you could, how that worked; what you did

24   in order to make more of an emphasis on street-level drug

25   offenses.

1    A.    So the objective was to meet on a weekly basis.  We would

2    rally up at a predetermined location.  And they would assign

3    teams, and all these teams would be designated in an area that

4    we felt there was a high volume of drug activity.  And those

5    units would be teamed up with about eight -- between 8 and 12

6    other detectives, and we would conduct surveillance in those

7    areas.

8    Q.    Who was on your team back on July 10th of last year?

9    A.    I was assigned to the FBI agents that worked out of the

09:10 10    Lowell residence areas.

11    Q.    Specifically which agents?

12    A.    That day I was partnered up with Agent Gary Cacace.

13         THE COURT:  How do you spell the last name?

14         THE WITNESS:  It's C-a-c-a-c-e, I believe.

15         THE COURT:  Thank you.  Is this team, what is normally

16    known as the task force?  Or were you known as a team?

17         THE WITNESS:  The team was not necessarily -- I guess

18    you could say they were kind of a task force in themselves, but

19    these teams were essentially the teams that met every single

09:10 20    week together.  So I wasn't necessarily a task force agent, but

21    I was assisting them during the operations still as a detective

22    with the police department.

23    Q.    What other agents, Detective Gonzalez, were part of the

24    team along with you and Special Agent Cacace?

25    A.    Agent Keith Weidlich; Agent Adam Boynton; Task Force

1    Officer Daniel Cronin; Detective Mike Reardon and Detective

2    Mike Gilligan from the North Andover Police Department.

3    Q.   Of those officers, who were you actually riding with on

4    July 10th?

5    A.   Agent Gary Cacace.

6            MR. PANICH:  Your Honor, I would like to put up on the

7    screen a document that I have premarked as Exhibit 1.  With

8    your permission, may I approach and provide the clerk with a

9    copy?  Or I can just put a copy on the projector.  Whatever you

09:11 10   prefer.

11           THE COURT:  You tell us what you want to do, and Lisa

12   will accommodate you, assuming our system will work.

13           THE CLERK:  It is.

14   BY MR. PANICH:

15   Q.   Detective Gonzalez, do you recognize what I've put on the

16   screen as Exhibit 1?

17   A.   Yes.

18   Q.   And what is on the screen?

19   A.   It appears to be a map of the south Lawrence east area of

09:13 20   the city.

21   Q.   What street am I pointing to here?  What street is that?

22   A.   That would be Portland Street.

23   Q.   Okay.  And how about here; what street is that?

24   A.   Osgood Street.

25   Q.   And then this street here, this diagonal one?

1   A.   That's Loring Street.

2   Q.   And this one here, which street is that?

3   A.   Salem Street.

4   Q.   Does it fairly and accurately reflect the section of

5   Lawrence that you were patrolling on July 10th of last year?

6   A.   Yes.

7           MR. PANICH:  Your Honor, I'd offer Exhibit 1 for

8   admission.

9           MR. KELLY:  No objection.

09:13 10          (Government Exhibit 1 received in evidence.)

11  BY MR. PANICH:

12  Q.   How would you characterize Portland Street, Detective

13  Gonzalez?

14  A.   Portland Street is kind of an obscure street.  Its

15  residences line up one side of the street.  There's not many

16  houses on that side of the street.  And then on the opposite

17  side of the street is the train tracks.

18          MR. PANICH:  I would like to put up a second document.

19  It's been premarked as Exhibit 2.

09:14 20  BY MR. PANICH:

21  Q.   Do you recognize what I have put up on the screen?

22  A.   Yes.

23  Q.   And what is that?

24  A.   That would be Portland Street.

25  Q.   Does it fairly and accurately reflect Portland Street?

A.    Yes.

         MR. PANICH:  I offer this for admission, Exhibit 2.

         MR. KELLY:  No objection.

         (Government Exhibit 2 received in evidence.)

BY MR. PANICH:

Q.    So you mentioned -- strike that.

         How, if at all, does the nature of this street enable drug traffickers to conduct drug transactions on Portland Street?

A.    In my training and experience, a lot of the times when we dealt with street-level drug transactions, the sources or the dealers would choose locations that are relatively quiet, kind of out of sight, out of mind, away from the public's eye.

Q.    And how does Portland Street fit that bill?

A.    Our drug unit has had a lot of experiences on Portland Street.  We have done numerous search warrants on houses over there.  We've done a few Terry stops, have made drug arrests that stem from Portland Street itself.

Q.    Okay.  And what's a controlled buy?

A.    A controlled buy would be a -- a controlled buy is a -- how would I say it?  It would be a buy that is under the control of the detectives itself.  We would have some sort of confidential informant go in and make a purchase under our direct supervision and obtain a predetermined sum amount of illegal narcotics.  That way we could just continue to gather

1   intelligence on the source or the dealer himself.

2           Or sometimes we'll go directly to what we call a

3   buy-bust where we have a CI doing a controlled buy, and then we

4   arrest the source immediately after.

5   Q.   And has -- in a controlled buy, who typically selects the

6   location for the buy?

7   A.   It's really circumstantial.  It would depend on whether we

8   grab the source or the buyer at that location or if we

9   know -- the City of Lawrence, we have an anonymous tip line.

09:16 10   So we'll know well in advance which areas have resaturated with

11   a lot of drug traffic or foot traffic.

12   Q.   How many times, if any, are you aware of dealers under

13   investigation who select Portland Street as the location for a

14   controlled buy?

15   A.   You know, I could say with confidence that in my five

16   years of being on the job, we spend a lot of time on Portland

17   Street; I would say probably about 20 percent of our time every

18   year on Portland Street because of the drug activity over

19   there.

09:17 20   Q.   What -- turning your attention back to July 10th of last

21   year, what did you observe on Portland Street during the course

22   of that afternoon?

23   A.   Myself and Agent Cacace drove up the length of Portland

24   Street, and we noticed that there was a vehicle that was

25   idling, facing westbound on Portland Street parked on the train

1   track side.

2   Q.   Do you recall what kind of car it was?

3   A.   Yes.

4   Q.   What kind of car was it?

5   A.   It was a smaller compact vehicle, a Kia, I believe.

6   Q.   And what did you observe relative to the Kia at that

7   point?

8   A.   At that point it had been the only vehicle on the street

9   that was idling with somebody inside of it, so we just decided

09:18 10   to kind of park just on the same side of the street but having

11   some sort of vantage point to keep an eye on it.

12   Q.   How many people were in the Kia?

13   A.   One.

14   Q.   Having observed the Kia for a time, what did you observe

15   after that?

16   A.   After that, I noticed that a white male had crossed the

17   street.  And he beelined for the vehicle and gained access into

18   the passenger's side of the vehicle.

19   Q.   What, if anything, did you think about that at that

09:18 20   particular time?

21   A.   It definitely heightened our senses.

22   Q.   Why is that?

23   A.   There's a lot of indicators that kind of come into play

24   when we try to develop a reasonable suspicion of probable cause

25   when it comes to drug interaction and drug behaviors.  Seeing

that the male had just showed up on foot and he went directly
to the passenger's side and got in, you know, we felt that
there was suspicion that a drug transaction might be taking
place.

Also, while he was crossing the street, I overheard a
radio broadcast that he had money in his hand, which was
another --

THE COURT:  Sorry.  The radio broadcast said what?

THE WITNESS:  We overheard a radio broadcast that the
male that was walking over to the vehicle had money in his
hand.

THE COURT:  Excuse me.  Were you parked and did you
see the car on -- where it would have been on this picture?  I
mean, does this picture show the location that you observed?

THE WITNESS:  Yes.

THE COURT:  Where approximately is it?

THE WITNESS:  So the Kia, there's a little retainer
wall to the right side of it.

THE COURT:  Where that big tree is?

THE WITNESS:  Yes.  So across the street, the Kia was
parked --

THE COURT:  Next to -- is it a railroad track?

THE WITNESS:  Yes.  He was parked on the side of the
railroad track.

THE COURT:  Across from the big tree?

```
 1              THE WITNESS:  Correct.
 2              THE COURT:  And where did this person come from that
 3      you just mentioned?
 4              THE WITNESS:  This person showed up on foot.  We first
 5      observed him when he first came into the street.  Once he
 6      came into --
 7              THE COURT:  From where?
 8              THE WITNESS:  We were on the same side of the street.
 9              THE COURT:  You were on the same side?
10              THE WITNESS:  Yes.
11              THE COURT:  Where did this person come from?
12              THE WITNESS:  I didn't observe him.  If I had to cast
13      an opinion, I would say that person walked up on foot.
14              THE COURT:  If you didn't see him, that's okay.  I
15      just want to -- so you were also across from the tree but
16      further back or in front of the Kia?
17              THE WITNESS:  Yes, yes.
18              THE COURT:  Thank you.
19      BY MR. PANICH:
20      Q.   What, if any, significance did you ascribe to the money
21      that you heard about on the radio?
22      A.   The money is one of the biggest components when it comes
23      to drug transactions, which is something we've often seen
24      during hand-to-hand transactions, whether it's foot-to-vehicle
25      or person-to-person.
```

1  Q.   What, if any, research did you conduct into the Kia that

2  you observed the gentleman get in?

3  A.   We -- initially the plate wasn't ran until the vehicle

4  started to go mobile.  But we did run the plate, and we noticed

5  that the plate had come back to an organization which is

6  registered to Eshan companies.

7  Q.   What do you know about Eshan?

8  A.   Prior to this specific surveillance, I had a conversation

9  with an officer, Scott McCabe, who informed me that this

09:22 10  specific company might be involved with registering multiple

11  vehicles to harbor drug dealers to do their low-end running.

12  Q.   You mentioned that the Kia went mobile.  Where did it go?

13  A.   So the -- as soon as he -- the passenger had gained

14  entrance, the vehicle went on the move.  It drove up Portland

15  Street to Osgood Street.

16       MR. PANICH:  I'm going to put Exhibit 1 back on the

17  screen.

18  BY MR. PANICH:

19  Q.   So after it hit Osgood Street, where did it go?

09:22 20  A.   It took a left onto Market Street.

21  Q.   How about after that?

22  A.   And then it took a right onto Loring Street.  And then

23  from Loring Street, once it reached Salem Street, it took a

24  right.  And then it pulled over about -- maybe about four or

25  five car lengths in onto Salem Street.

```
 1              MR. PANICH:  I am going to put on the screen what's
 2    been marked as Exhibit 3.
 3    BY MR. PANICH:
 4    Q.   Does this fairly and accurately characterize the route
 5    that the Kia took?
 6    A.   Yes.
 7    Q.   Okay.  And I know it's difficult to read, but can you tell
 8    the distance that it traveled?
 9    A.   It's three-tenths of a mile.
10              THE COURT:  Did you follow it?
11              THE WITNESS:  Yes.
12    BY MR. PANICH:
13    Q.   What happened once the Kia reached Salem Street?
14    A.   Once he reached Salem Street, we observed the passenger
15    exit the vehicle; and then from that vehicle he walked directly
16    to another vehicle, gained access into the passenger's seat;
17    and then that vehicle pulled a U-turn right on Salem Street and
18    headed back towards Loring Street.
19    Q.   I want to return to that in a moment, but what
20    significance did you ascribe to a ride of this length?
21    A.   It was an awfully short distance to give somebody a ride.
22    Q.   What difference does that make from your perspective as a
23    narcotics investigator?
24    A.   One of the things that our drug unit always makes common
25    reference to is what we call as a meaningless ride to nowhere.
```

1    Q.    What's a meaningless ride to nowhere?

2    A.    So the meaningless ride to nowhere usually occurs when

3    either a drug source or the buyer shows up on scene, picks up,

4    you know, either party, and they take a ride.  Usually, you

5    know, the distance is relatively a short distance, and either

6    the drug dealer or the source will be let out.  There's no

7    stops in between.  Nobody go -- they don't make any stops to go

8    to any stores or visit any residences.

9          Primarily what takes place inside of -- or what

09:25 10   happens within that ride, the drug transaction occurs, and then

11   both parties will be separated and be on their way.

12   Q.    Why would a drug dealer want to use a brief meaningless

13   ride to nowhere to conduct a drug transaction?

14   A.    Concealment primarily.  You don't see the drug deal happen

15   in plain public's view.

16   Q.    How many times have you seen something like this before?

17   A.    I've -- in my experience, I would say that I encountered

18   that more than I witness hand-to-hand transactions.

19   Q.    And having seen a ride like this, how often have you

09:26 20   subsequently discovered the drug transaction had taken place

21   during that ride?

22   A.    The majority of the time we determine that a drug

23   transaction had taken place within inside of that vehicle.

24   Q.    So at this point what did you think you had just seen?

25   A.    I believe that there was a drug transaction that had taken

1    place within that -- the vehicle.

2    Q.   So you mentioned earlier where the passenger had exited

3    the Kia.

4         MR. PANICH:  I am going to put on what's been marked

5    as Exhibit 4.

6    BY MR. PANICH:

7    Q.   Do you recognize the intersection here?

8    A.   Yes.

9    Q.   What intersection is that?

09:26 10   A.   That's Loring Street, and a little further back is

11   Salem -- actually, this is Loring Street, and then this is

12   Salem Street.

13   Q.   Okay.  So I know that the labeling is confusing, but which

14   street is this right here?

15   A.   That's Loring.

16   Q.   And then this?

17   A.   Salem.

18   Q.   Okay.  Where did you --

19        THE COURT:  Excuse me.  Do the streets in Lawrence

09:27 20   have these -- the names on them, written on the pavement like

21   this, or is that just the photograph?

22        THE WITNESS:  That's the photograph, Your Honor.

23        MR. PANICH:  I can represent that's what Google Maps

24   does when you go on Street View.

25   BY MR. PANICH:

1    Q.   So what is this building here that I'm pointing to on the

2    left at this corner?

3    A.   That's a convenience store or referenced as a bodega.

4         MR. PANICH:  I put on the screen what's been marked as

5    Exhibit 5.

6    BY MR. PANICH:

7    Q.   Do you recognize this intersection?

8    A.   Yes.

9    Q.   Is it the same intersection, just zoomed in?

09:28 10   A.   Correct.  It's further west.

11   Q.   So can you describe where you saw the passenger exit the

12   Kia?

13   A.   So there's -- it looks like there's a pole to the right.

14   Q.   This right here?

15   A.   Exactly.

16   Q.   Okay.

17   A.   So the vehicle pulled up a little beyond that pole, that

18   light pole.

19   Q.   And when the passenger exited the Kia, which direction did

09:28 20   he go?

21   A.   The passenger exited the Kia and walked to a vehicle that

22   was parked right in front of it.

23   Q.   And did you see what kind of car that was that he got

24   into?

25   A.   It appeared that it was a dark-colored Buick.

```
 1            MR. PANICH:  Your Honor, I would like to offer Exhibit
 2     5 for admission.
 3            MR. KELLY:  No objection.
 4            MR. PANICH:  And I don't think I offered Exhibit 4.  I
 5     would like to offer that, as well.
 6            THE CLERK:  Or 3.
 7            MR. PANICH:  3, 4 and 5, Your Honor.
 8            THE COURT:  Okay.
 9            (Government Exhibits 3 through 5 received in
10            evidence.)
11     BY MR. PANICH:
12     Q.   After you saw the passenger exit the vehicle, what did you
13     do?
14     A.   The radios were kind of horrible in that area, so we were
15     trying to give out a live feed of what we believed was
16     occurring.  So we gave out a radio transmission of the vehicle
17     that was in front of us, being occupied by two other males.
18     Myself and Agent Gary Cacace, we decided that we wanted to stay
19     with the Kia and the subject inside that vehicle.
20     Q.   And so what did -- did you do that?
21     A.   We followed him away.  We drove up Salem Street.  We ended
22     up -- my knowledge isn't very clear as to -- at some point we
23     ended up on Blanchard Street behind the Haffner's gas station.
24     So we either took a right on Osgood Street or South Union
25     Street.  But once we ended up on Merrimack Street -- is it
```

1    Merrimack?  No.  It's Market by Jackson Lumber.  And as we

2    approached Haffner's gas station, myself and Agent Cacace kind

3    of -- we noticed that the subject in that vehicle was like

4    really fixated on that rearview mirror.

5    Q.   Before we get to that, I am going to put on the screen

6    what's been marked as Exhibit 6.  This is a little difficult to

7    see.  This is zoomed out.

8         THE COURT:  How can you tell whether a driver in front

9    of you is fixated on the rearview mirror?  I'm asking for my

09:31 10    own benefit.

11        THE WITNESS:  At that point -- this is something that

12   I often have a lot of experience with.  At that point you could

13   tell that his eyes aren't on the road.  You can actually see

14   that his eyes are looking through the rearview mirror.  So it's

15   almost as if he's gazing towards --

16        THE COURT:  You mean you can see on the mirror --

17        THE WITNESS:  Yes.

18        THE COURT:  -- his eyes?

19        THE WITNESS:  Yes.  And the side-view mirror, as well.

09:31 20 You could see that they're not facing forward, but they're

21   looking up, and they are also looking to the left to the

22   side-view mirror, as well.

23        THE COURT:  I thought that was a sign of careful

24   driving.

25        THE WITNESS:  Not if you're going forward.

BY MR. PANICH:

Q.   How long did you observe the driver as you were following him?

A.   I mean, we stayed with him initially from that point that he had pulled onto Salem Street until we initiated contact with him.

Q.   And how long in minutes?

A.   I would say probably no less than two minutes.

Q.   And so how did that -- what happened after you followed him for two minutes?

A.   We got to the end of Blanchard and Salem Street.  Right before we got to Salem Street, we decided that we wanted to activate our lights and sirens.

Q.   Why is that?

A.   My hope was that he would pull over.  We felt like there was just enough space for him to pull over.  But once I initiated the lights and sirens, he took a right onto Salem Street, right before there's a bridge that was located right there.  I felt like he could have pulled over beforehand, but he just kept on driving until he got over the bridge.  And then once he ended up in front of St. Patrick's Church, right before Carter Street, he pulled over at that point.

Q.   Where did you position your car relative to the Kia?

A.   I ended up pulling ahead of him.

Q.   Why?

A.   The reason for it was because during that time, as soon as
I activated the lights and sirens, seeing that he was just
really fixated on us behind him -- as soon as we activated the
lights and he knew that we were behind him, I could observe
that there was a lot of movement from the driver's side area.
I could see that he was shifting.  I could see his shoulders;
they were rising up and above.  There was just -- there was a
lot of movement from the time that I had activated the lights
until the time that he decided to stop.

09:33 Q.   What significance did you see in the shifting?

A.   To me it looked like he could be concealing something.

Q.   Okay.

A.   My thought process by going ahead of him was I didn't know
if, you know, if his thought process was to take off once we
pulled him over if we were still behind him, as well.

Q.   From the time you turned on your lights and sirens to the
time he actually stopped, how much time actually transpired?
Was it immediate?

A.   It wasn't immediate, no.

09:34 Q.   After he stopped the Kia, what did you do next?

A.   I -- we had gave the radio transmission out to the other
area cars to let them know that we had stopped the vehicle just
past the bridge.  And I exited the driver's side and Agent Gary
Cacace exited the passenger's side, and I walked right up to
the driver's side window.

1    Q.   Okay.  Do you recognize the driver sitting in court today?

2    A.   Yes.

3    Q.   Who is it?

4    A.   He's sitting to my right, wearing a white-collared shirt

5    and a beard.

6         MR. PANICH:  Let the record reflect that Detective

7    Gonzalez has identified the defendant, Jason Jimenez.

8         THE COURT:  Okay.

9    BY MR. PANICH:

09:35 10   Q.   Once he stopped and you got out of the car, what did you

11   observe about the defendant's demeanor?

12   A.   Well, when I drove -- when I drove by him, I could still

13   see that there was a little bit of movement.  As I approached,

14   he was nervous but not moving as much as he was when we had

15   first initiated contact.

16   Q.   And what concerns, if any, did you have about that?

17   A.   Well, there's two things:  The first thing, always for us,

18   is that it's a huge safety issue.  We just want to make sure

19   that there's nothing within his control to hurt us.  So we're

09:36 20   thinking weapons, automatically.

21        And then the other thing is, just based on the

22   indications of us doing a drug investigation, my assumption

23   would be that he was shifting around so he could try to conceal

24   something.

25   Q.   What's your ordinary practice when you first approach a

1   suspect to question him?

2   A.   For us, our drug unit, we're very heavy because we try to

3   sit on a lot of these investigations long enough where as soon

4   as we make contact with the suspect, we immediately go into

5   Miranda.

6   Q.   And why is that if the suspect is not yet cuffed?

7   A.   A lot of it is because we have all these observations in

8   hand, and we feel that that questioning is going to lead into

9   the investigation itself and that they might say something to

09:37 10   incriminate themselves.

11   Q.   So how do you -- do you typically offer the defendant his

12   Miranda rights?

13   A.   I always read it from a card.

14        MR. PANICH:   I am going to put up on the screen what I

15   have now marked as Exhibit 6.   It's two pages.

16   BY MR. PANICH:

17   Q.   Do you recognize what I have put on the screen?

18   A.   Yes.

19   Q.   What is it?

09:37 20   A.   It's a Lawrence Police Department Miranda warning.

21        THE COURT:   Excuse me.   I'm not clear.   When you

22   stopped in front of the car, then you went back to the Kia?

23        THE WITNESS:   Yes.

24        THE COURT:   And what happened next?   Did the defendant

25   get out of the car?   Did you tell him to get out?   Where does

       1   the Miranda warning fit with respect to the defendant's
       2   position?
       3           THE WITNESS:  So when I get to the vehicle, Your
       4   Honor, I -- as soon as I make contact, I believe that I had the
       5   door open at this time, and then I read him the Miranda
       6   warning.
       7           THE COURT:  Before you said anything else?
       8           THE WITNESS:  Yes.
       9   BY MR. PANICH:
09:38 10   Q.   And is this -- does this -- does Exhibit 6, excuse me --
      11   is this the same card that you read from when you're giving
      12   Miranda warnings?
      13   A.   Yes.
      14           MR. PANICH:  Your Honor, I'd offer Exhibit 6 for
      15   admission.
      16           THE COURT:  I'm sure there's no objection.
      17           (Government Exhibit 6 received in evidence.)
      18   BY MR. PANICH:
      19   Q.   Do you use this card or a facsimile of it in offering the
09:38 20   defendant his Miranda rights?
      21   A.   Correct.
      22   Q.   What happened after you offered him his Miranda warnings?
      23   A.   At this time we had confronted him.  We asked him if there
      24   was somebody -- actually, what I do is I relay the facts.  I
      25   let them know that I'm a narcotics investigator.  I actually

1  told him what I had observed, that we had observed him pick

2  somebody up, and that he drove them for a short distance and

3  then he dropped them off.

4  Q.   What did he say about that?

5  A.   At first he denied that there was even anybody in his

6  vehicle.

7  Q.   So what did you do?

8  A.   We then -- you know, we asked him again if he wanted to

9  shoot straight with us.  And then he said that he did, in fact,

09:39 10  pick somebody up to give them a ride.  And during that

11  time -- my focus was a little -- I was a little uneasy because

12  I didn't know if subconsciously he just kept on -- his right

13  arm kept on going in between his legs.

14  Q.   Did he have a phone on him at that time?

15  A.   Yes.

16  Q.   Okay.  And what did he do with the phone?

17  A.   Once I laid out the groundwork from where we were coming

18  from, he asked if he could record the whole interaction between

19  him and I, and I said that he was more than welcome to.  The

09:39 20  only thing I didn't want him to do was to have the phone in his

21  hand because he was the target of the investigation.

22  Q.   So where did he put the phone?

23  A.   He put the phone on the center console.

24  Q.   Did he activate the phone or request to record before or

25  after the Miranda warnings?

1    A.    I honestly don't recall if I did it on video or not.

2    Q.    But where did he put the phone?

3    A.    He put it on the center console.

4    Q.    So after he acknowledged that he did give an individual a

5    ride, where did he say he had gave that individual a ride to?

6    A.    His -- he had a lot of stories.  And the thing was -- is

7    that I couldn't really keep track of which one he was, you

8    know, trying to relay to me as it related to what we had

9    witnessed.

09:40  10           So at one point he said that he came from Wal-Mart.

11   At one point he said that he gave his friend a ride to the

12   train station.  There were just many stories that I couldn't

13   really keep track of a lot of them, but those were just two of

14   the ones that I do recall.

15   Q.    But, in any event, did you observe where the passenger had

16   actually gone?

17   A.    Yes.

18   Q.    And where was that?

19   A.    He actually got dropped off on Salem Street and gained

09:41  20   access into another vehicle.

21   Q.    So after having heard these explanations from the

22   defendant, what did you do?

23   A.    At that point, just based on him just going to the center

24   of his legs, I asked him if he could get out of the car.  He

25   did so.  He was cooperative in that manner.

1           As he exited, I noticed that he was kind of a big

2      kid, pretty athletic.  And, you know, for us, from our view, we

3      do encounter people running from us, so that was kind of going

4      through my head.  So I asked him to walk to the back of the

5      car.  But as he walked there, I walked with him.  And I grabbed

6      the back of his belt, and I escorted him to the back of the

7      vehicle.

8      Q.   Why did you ask him to get out of the car in the first

9      place?

09:42 10    A.   Because the movement with his hand -- I just wasn't

11     entirely comfortable with him just keeping, you know, throwing

12     that hand in between his legs.

13     Q.   When you got him out of the car, did you observe him

14     carrying anything else?

15     A.   He wasn't carrying anything.  But when I looked at the

16     seat where he was, he had another phone.

17     Q.   The phone in addition to the one that he had been

18     recording with?

19     A.   Correct.  It was a second phone.

09:42 20    Q.   What did you think about the existence of a second phone?

21     A.   It's just one of many other indicators for us where we --

22     more often than not when we lock up the source specifically or

23     the drug dealer, they carry multiple phones.  One phone is for

24     personal use, and then the second phone is usually for

25     business.

Q.   And by "business," what do you mean?

A.   Those calls -- those phones are primarily used for drug runners to either get directed or make phone calls to, you know, the main source.

Q.   Finally, where was the first phone, the one that he used to record the interaction, where was that once he was out of the car?

A.   It stayed in the center console.

Q.   So what concerns, if any, did you have about your safety?

THE COURT:  Excuse me.  Does that mean that there was no recording of any conversation when he went to the back of the car?

THE WITNESS:  I don't believe so unless the audio might have gotten picked up.  But I know, you know, for certainty that the phone did stay inside the vehicle.

BY MR. PANICH:

Q.   Detective Gonzalez, what, if any, concerns did you have about your safety at that point?

A.   Well, at that point, just based on all the movement that was being done inside of the vehicle, it's always a threat for us once they're outside.  So, you know, once we put him to the -- when we brought him to the rear of the car, we decided that we wanted to pat frisk him.

Q.   And how did the defendant physically react to the pat frisk?

A.   Initially I was able to do a pat frisk, but then I noticed
that there was just -- there was a hard object by his left
pocket and I -- you know, I just -- I stayed there, you know,
for a couple of seconds.  And I'm like, okay, there's
definitely something here.

Q.   Did he physically react to your touching the hard object?

A.   Yes.

Q.   How?

A.   He -- the second time that I had brought it to -- because
some of the agents just kind of started to filter on, so the
second time that we decided, I'm like, there's definitely
something weird.  You could even visually see that it was
weird.  So when I went to go back in to try to pat it down, he
pulled his hips out.  And then, you know, at that time I
confronted him.  I said, "Okay.  Listen, you know, the jig is
up."

Q.   Before we get to that -- I apologize.

A.   Yes.

Q.   You mentioned two pat frisks?

A.   Yes.

Q.   Can you explain that?

A.   Well, because we -- I think I was trying to confirm to
myself that there was definitely something that was out of
place there.  It was a hard object.  It wasn't something that I
would typically feel normally.  I've done thousands and

1    thousands of pat frisks, and I knew that there was just an odd

2    object that didn't belong there.

3    Q.   So why did you feel the need, then, to do a second pat

4    frisk?

5    A.   It was just to confirm the first pat frisk, to verify.

6    Q.   With respect to the first pat frisk, was there anything

7    else you felt?

8    A.   Yes.

9    Q.   What?

09:46 10   A.   In his left pocket he had, like, a circular cylinder.  And

11   I had asked him what it was, and he said that it was a lip

12   balm, a ChapStick.

13   Q.   What did you do with respect to that?

14   A.   I asked him if I could pull it out, and he said that I

15   could.  And when I pulled it out, it was exactly what he said

16   it was.

17   Q.   By the way, who -- what was Special Agent Cacace doing at

18   this time?

19   A.   He was with me.  He was covering me.

09:46 20   Q.   And you mentioned earlier, I think, before I interrupted

21   you, and I apologize for that, you said something to the

22   defendant.  What was that?

23   A.   Yes.  I made a reference.  I said, "Listen, you know, I

24   think that you sold that guy drugs."

25            And he said, "It is what it is," almost giving us a

1    confirmation that, you know, there was something amiss.

2    Q.   What did you do in response to that?

3    A.   So in response to that -- Mike Reardon was there, as well,

4    with Task Force Agent Cronin.

5    Q.   When did they arrive?

6    A.   They arrived -- I want to say it was during the pat frisk

7    when they arrived.  They actually -- they confirmed.  They

8    corroborated my observations, as well, by seeing the bulge.

9    And then Detective Mike Reardon pulled the item up from his

09:47 10    pants.

11             MR. PANICH:  May I have a moment, Your Honor?

12             THE COURT:  I'm sorry?

13             MR. PANICH:  May I have one moment?

14             THE COURT:  Yes.

15             (Attorneys confer.)

16    BY MR. PANICH:

17    Q.   Detective Gonzalez, did you see what the item was that he

18    had recovered?

19             THE COURT:  I'm sorry.  Who did the discovery

09:47 20    search -- the discovery pat frisk?

21             THE WITNESS:  I believe it was Detective Mike Reardon.

22             THE COURT:  So you did the two, and then somebody else

23    did the third?

24             THE WITNESS:  Yes.

25    BY MR. PANICH:

1    Q.   And what the judge just referred to as the third, where

2    was that in relation to him saying, "It is what it is"?

3    A.   Yes.

4    Q.   Sorry.  Was it before -- when he said, "It is what it is,"

5    did Detective Reardon recover the item after that?

6    A.   Yes, correct.

7    Q.   Did you see what he had recovered?

8    A.   Yes.

9    Q.   What was it?

09:48 10   A.   We pulled out a baseball size of illegal narcotics.

11   Q.   And how did you recognize it as illegal narcotics?

12   A.   Just based on our training and experience and the

13   packaging.

14        MR. PANICH:  Okay.  Your Honor, I don't have any

15   further questions for Detective Gonzalez.

16        THE COURT:  Mr. Kelly?

17        MR. KELLY:  Would you like me to do it from the

18   podium, Your Honor?

19        THE COURT:  I'm sorry?

09:49 20        MR. KELLY:  Would you like me to do it from the

21   podium?

22        THE COURT:  It's up to you.  If you do it from some

23   distance, the witness tends to be loud enough so I can hear

24   him.

25        MR. KELLY:  Okay.

                          CROSS-EXAMINATION

BY MR. KELLY:

Q.   Good morning, Detective Gonzalez.  My name is Paul Kelly.
I'm the attorney for Mr. Jimenez.

          Let me ask you:  Have you ever testified in federal
court before, sir?

A.   No, sir.

Q.   So you were a -- you've been a detective or a narcotics
investigator for about five years?

A.   Yes.

Q.   How old are you, sir?

A.   42.

Q.   Okay.  And in the summer of 2019, you had been a narcotics
investigator for about four-and-a-half years?

A.   Correct.

Q.   And your training consisted of, you said, a 90-day
training with some officer, attending a couple of conferences,
and then largely on-the-job training?

A.   Yes.

Q.   And that you've observed over 100 drug deals or had been
involved in them to some respect?

A.   Correct.

Q.   Now, are you aware that after the arrest of Mr. Jimenez on
July 10th of 2019 that the United States Attorney's Office and
I believe your department in Lawrence issued a press release

```
 1    trumpeting their activities that particular day?

 2              MR. PANICH:  Objection, relevance.

 3              THE COURT:  I don't know.

 4    BY MR. KELLY:

 5    Q.   Are you aware of that?

 6    A.   I'm aware that they did a press release at the end of the

 7    sting operation, yes.

 8    Q.   And --

 9              MR. KELLY:  If I could, Your Honor, if I could

09:50 10   approach?  Give this to the Court.

11              THE CLERK:  Is this an exhibit?

12              THE COURT:  It's okay.  I can see it on the screen.

13              MR. KELLY:  Your Honor, I would like to mark this.

14    Use letters A, B, C, D?

15              THE CLERK:  Yes.  This is A.

16              THE COURT:  Any objection?

17              MR. PANICH:  I'm really not sure of the relevance,

18    Judge.

19              THE COURT:  At least for now; otherwise, it seems to

09:51 20   be somewhat relevant.  So we'll see.  We'll mark it for

21    Defendant Exhibit A, right?

22              THE CLERK:  Yes.

23              (Defendant Exhibit A received in evidence.)

24    BY MR. KELLY:

25    Q.   So this press release was issued in September but talks
```

about an operation in the Merrimack Valley, which is the same

operation that you were making reference to when you described

these various weekly meetings and some of the efforts that was

being made by the task force and the related departments,

correct?

A.   Correct.

Q.   And in this -- in Pages 2 and 3 and 4, there's a list of

38 individuals who were arrested and charged, which is what is

captured by the title there of Exhibit A.  So this was what we

would describe as a big sweep, right?

A.   Yes.

Q.   And in the last paragraph there on Page 4, it lists the

various departments that participated in these law enforcement

efforts?

A.   Yes.

Q.   And this arrest of Mr. Jimenez was part of that.  In fact,

his name is listed here as Number 19, correct?

A.   Yes.

Q.   Now, let me take you to the, first of all, the location

here that we're talking about on Portland Street.  This is

really a residential area.  I mean, when you go down this

Osgood Street, as we saw on the map in Exhibit 1, there are a

series of residential homes; there's a baseball field.  It's a

suburban area; is it not?

A.   It's suburban.  But it's a little bit on the light side so

1    not many houses over there.

2    Q.   So this appeared -- I'm sorry -- I apologize for

3    the -- maybe I can zoom this in here a little bit.

4         MR. PANICH:  I have a copy.

5         MR. KELLY:  You have a better copy?

6    BY MR. KELLY:

7    Q.   So down through this part, these are all homes, correct?

8    A.   Correct.

9    Q.   And this is like a baseball field --

09:54 10   A.   Yes.

11   Q.   -- right?

12        And there are some schools in the area, correct?

13   A.   Not in that specific area, not in that block, or the grid.

14   Q.   Okay.  Where is the nearest school?

15   A.   It's on the flip side of the Shawsheen River Trail.

16   Q.   And this is the railroad tracks that you pointed out?

17   A.   Correct.

18   Q.   And on the other side of the railroad tracks, which you

19   can't really see on this, are industrial warehouses and things

09:54 20   of that nature, correct?

21   A.   Yes.

22   Q.   Now, isn't it the case, Detective Gonzalez, that the first

23   thing that you observed when you went out to do work in this

24   particular area on this day was you observed a dark-colored

25   Buick automobile, correct?

1    A.    I didn't observe the dark Buick automobile, no.

2    Q.    I'm sorry.  Say that again.

3    A.    I didn't see the dark-colored Buick until the passenger

4    was let off.

5    Q.    You were riding with Special Agent Cacace of the FBI?

6    A.    Correct.

7    Q.    And were you the driver?

8    A.    Yes.

9          MR. KELLY:  Your Honor, if we could approach.  And I

09:55 10   would like to mark as Exhibit B this FBI investigative report.

11         MR. PANICH:  Objection, hearsay.

12         THE COURT:  Well, I don't know.  We'll mark it for

13   identification, but I don't know even what he's going to do

14   with it.

15         MR. PANICH:  Okay.  I'll defer.

16         THE COURT:  B for identification.

17         (Defendant Exhibit B marked for identification.)

18   BY MR. KELLY:

19   Q.    I am showing you the first page of a report, which at the

09:56 20   top here you can see it says on July 10th that Supervisory

21   Agent Cacace and yourself initiated a traffic stop, right?  And

22   have you read this report by Agent Cacace?

23   A.    Yes, I've reviewed it.

24   Q.    And what he says right at the start here in this paragraph

25   that begins at approximately 5:00 p.m. --

1          THE COURT:  This is being offered for what purpose?

2          MR. KELLY:  I want to just ask him about what he

3     observed and what he's told us about, because what he told us

4     about was that --

5          THE COURT:  But this is somebody else's document.

6          MR. PANICH:  Your Honor, both of the individuals who

7     have signed this report, if Mr. Kelly scrolls to the bottom,

8     are here today.

9          THE COURT:  Well, they are hearsay with respect to

09:57 10   this witness.  Is either of them going to be a witness?

11         MR. PANICH:  Yes.

12         THE COURT:  Well, I mean, I don't know how you can --

13         MR. KELLY:  I can move this along, Your Honor.

14         THE COURT:  Yeah, okay.

15    BY MR. KELLY:

16    Q.   Are you aware, Detective Gonzalez, that Special Agent

17    Cacace in his report indicates that the first thing that you

18    observed when you went out that day at roughly 5:00 p.m. was a

19    dark-colored Buick sedan?

09:57 20        MR. PANICH:  Your Honor, he is reading from the

21    report.

22         THE COURT:  That may be the agent's observation.  He

23    had a different one.  So I don't know how you --

24    BY MR. KELLY:

25    Q.   That's not your testimony, that the first thing that you

1    observed was a dark-colored sedan?

2    A.    No.  I observed it at the last part of the incident.

3    Q.    So you said that what you observed is a car that was

4    parked and idling on Portland Street, with one occupant inside?

5    A.    Yes.  It was the only vehicle on the street.

6    Q.    Right.  Did you happen to observe what the occupant was

7    doing?

8    A.    I did not.  It looked --

9    Q.    Did you see whether or not he was texting or using his

09:58 10    cell phone?

11    A.    No.

12    Q.    You could not see that?

13    A.    No.

14    Q.    Did you drive by the vehicle at some point to get a closer

15    view?

16    A.    I drove by once, and that's when I noticed him.  And then

17    I set up surveillance on it.

18    Q.    And then at some point -- first of all, isn't it a fact,

19    sir, that there were a number of agents out on the street on

09:58 20    this particular day as part of this operation, roughly 10 or 12

21    agents?

22    A.    Yes.

23    Q.    And how many different cars were being used by law

24    enforcement that day, if you know?

25    A.    I would say a bare minimum.  There was probably about five

1   of us.

2   Q.   Okay.  So you've got all kinds of different law

3   enforcement cars moving around?

4   A.   Yes.

5   Q.   And prior to seeing this Kia parked on Portland Street,

6   were you involved in radio transmissions talking to the various

7   law enforcement officers in these other cars?

8   A.   We were doing our best --

9   Q.   Okay.

09:59 10   A.   -- because the radios -- I had testified the radios were

11   really choppy in that section.

12   Q.   And prior to the time that you observed this person

13   walking, this white male walking up the street, had you heard

14   over the radio from any of your fellow officers observations of

15   a person walking up the street?

16   A.   No.  We made that observation ourselves, that he

17   was -- once he was crossing the street, we made that

18   observation.

19   Q.   And do you know from what street that this person came?

09:59 20   A.   I would assume that he came from Osgood Street.

21   Q.   Okay.  Describe the person that you saw.

22   A.   He was wearing a flannel shirt, a hat, and black pants.

23   Q.   Okay.  This was July?  It was a warm day that day?

24   A.   Yes.

25   Q.   Can you describe the weather?

1    A.    Yes.  It was nice.  The sun was out.

2    Q.    And your recollection is that he was wearing a flannel

3    shirt and a hat?

4    A.    Yes.

5    Q.    And --

6    A.    It was a polo-style hat.  It wasn't like a winter cap.

7    Q.    Okay.  Did you -- you said that you overheard a radio

8    broadcast that one of your fellow officers observed this person

9    walking who appeared to have money in his hand; is that what

10:00  10    you told us?

11    A.    Yes.

12    Q.    Now, in your experience, would that be common, someone

13    heading up the street to do a drug deal would carry money

14    openly in his hand?

15    A.    Yes.

16    Q.    That would be common in your experience, sir?

17    A.    You'd be very surprised.

18    Q.    I would be.

19          And then you said that you ran the plate, or you had

10:01  20    somebody run the plate?

21    A.    Yes.

22    Q.    And it came back to something called Eshan corporation?

23    A.    Correct.

24    Q.    And then somebody told you over the radio, somebody by the

25    name of Scott McCabe, that this company was suspicious in some

1    regard because they rented vehicles to people involved in drug

2    transactions?

3              MR. PANICH:  Objection.  I think that mischaracterizes

4    his prior testimony in terms of when he learned that.

5              THE COURT:  Well, he can tell us yes or no.

6              THE WITNESS:  I had that conversation a week before

7    with Scott McCabe, Officer Scott McCabe, detective now.

8    BY MR. KELLY:

9    Q.   Who is Scott McCabe?

10:01 10  A.   He is a detective now.

11   Q.   So what brought up the conversation about Eshan

12   corporation a week before?

13   A.   Well, because he was giving me -- he was passing on

14   intelligence, because I'm on the drug unit, and he said he made

15   an encounter to corroborate that they're using that business to

16   harbor drug runners to make drug sales or illegal transactions.

17   Q.   Have you ever been to Eshan corporation?

18   A.   I have not.

19   Q.   Do you know anything about it?

10:02 20  A.   I do not.

21            MR. KELLY:  Your Honor, if we could approach and mark

22   a series of documents as Exhibit C.

23            THE COURT:  These are not in evidence, right, as yet?

24            MR. KELLY:  Well, Your Honor, I would offer these

25   documents.  What these are, Your Honor, the first document is

1    the incorporation records from the State of Massachusetts for

2    Eshan, Inc., showing that the company is owned and operated by

3    this Mr. Sam Eboigbe.  I don't know how he pronounces his name.

4    And the Articles of Incorporation for the company.

5         The third document, Your Honor, is a LinkedIn for

6    Mr. Eboigbe who was the proprietor of this business who also

7    runs a company called J&S Transportation.

8         THE COURT:  Well, but what is this being offered for?

9    As I understand the testimony of the witness during the direct,

10:03 10   he was told by somebody that Eshan is a corporation that deals

11   with drug dealers, that somehow helps drug dealers.

12        MR. KELLY:  The relevance is, Your Honor, that this is

13   a legitimate business.  This is a rental car agency that rents

14   cars, not unlike Hertz or Avis or Enterprise.  It rents cars to

15   people.

16        THE COURT:  So even if that's the case, I don't know

17   that that can attack this witness's credibility as to what he

18   learned at the time, which is the relevant issue here, isn't

19   it?  I mean, I think you can -- I'll take these documents as

10:04 20   part of the evidence, but I don't think that they're

21   particularly relevant to what the witness knew at the time that

22   he was doing his business.

23        (Defendant Exhibit C received in evidence.)

24   BY MR. KELLY:

25   Q.   So you relied on something you had heard from another

1  officer days before, but you had no direct or personal

2  knowledge of Eshan, Incorporated?

3  A.   I had no direct knowledge.

4        MR. PANICH:  Your Honor, I, just for the record,

5  object to the admission of these documents, particularly in

6  light of the detective's testimony.  He didn't know about it.

7        THE COURT:  We'll have them there, but I --

8  BY MR. KELLY:

9  Q.   Well, you know that --

10:04 10        THE COURT:  The issue is what he knew at the time and

11  what motivated him to do whatever he did.

12  BY MR. KELLY:

13  Q.   Simply because it was a rental car, in your view, made it

14  suspicious; is that what you are telling us?

15  A.   It's common for drug dealers to use rental vehicles so

16  that way they could -- that way they're not easily

17  identifiable, so yes.

18  Q.   And rental car companies, sir, as you know, you know, they

19  don't ask people about whether they're drug dealers or they

10:05 20  have criminal records at the time they rent the vehicle,

21  correct?

22  A.   I don't know what they do.

23  Q.   If this was a rental vehicle from Hertz or Avis or

24  Enterprise or Budget, would that have been suspicious to you?

25  A.   Just based on the context that I had experience with drug

1    dealers renting vehicles and if there's a commonality, yes, I

2    would say it's suspicious.

3    Q.   So you observed this person that was walking get into the

4    car, the Kia, and then the Kia immediately left the curb and

5    drove three-tenths of a mile, correct?

6    A.   Right.

7    Q.   And it went the route you described, down Loring Street,

8    turned the corner at Salem Street, and pulled over by the

9    telephone pole that we saw on the map?

10:05 10   A.   Correct.

11   Q.   And at that point a white male occupant IN the passenger'S

12   seat got out of the car?

13   A.   Correct.

14   Q.   And directly across the street, as we saw on the

15   photograph --

16        MR. KELLY:  Do you have that Exhibit 2 or 3 or

17   whatever it was?

18   BY MR. KELLY:

19   Q.   So this is the image -- this is Loring Street.  This is

10:06 20   Salem Street, correct?

21   A.   Correct.

22   Q.   And we saw a closer version here on Exhibit 5 that -- I

23   was showing you Exhibit 4 before -- but right here, just a

24   little bit off the page, is Hernandez Market?

25   A.   Correct.

1   Q.   It's a market which you described as a bodega?

2   A.   Yes.

3   Q.   There's a crosswalk right where the white car is.  So if

4   you dropped somebody off there, they could literally walk

5   across the crosswalk to these set of stores, including the

6   market, correct?

7   A.   If they dropped them off at the crosswalk, correct.

8   Q.   Right.  And you don't know, do you, sir, that the person

9   that was driving the Kia was simply dropping this person off

10:07 10   across the street from the market?

11   A.   No, because the passenger gained entrance into the other

12   vehicle, and the other vehicle -- we broadcast that the vehicle

13   was on the move, and the other agents couldn't find the other

14   vehicle.

15   Q.   Now --

16   A.   Which --

17   Q.   -- at that point, sir, the Kia did not immediately drive

18   away, did it?  The Kia remained idling along the side of Salem

19   Street where it had pulled over to drop off the passenger,

10:07 20   correct?

21   A.   The Kia dropped the passenger off, and then the Kia left.

22   Q.   Isn't it a fact, sir, that the Kia remained idling at the

23   curb and that you and Agent Cacace drove past the Kia at close

24   range so that you could look into the cab of the car?

25   A.   Yes, we did drive past it.

```
 1   Q.   And the Kia was still parked along the side of the street.
 2   He didn't immediately drive away after dropping off the
 3   passenger, did he, sir?
 4   A.   He drove away.
 5   Q.   At some point he drove away, right?
 6   A.   By the time we flipped the run on Osgood Street, we ended
 7   up behind the Kia again.
 8   Q.   He pulls over, lets the person off.  The driver of the car
 9   is texting or doing something on his cell phone.  You're
10   following at some distance behind.  You drive by so you could
11   get a closer look into the cab, correct?
12   A.   Not necessarily to get a closer look into the cab but just
13   to observe where the passenger was getting out and getting in.
14   Q.   You then drove past him, you went up to the next stop
15   sign, and you took a right onto Osgood?
16   A.   We took a right and did a U-turn.
17   Q.   Right.  And did you -- what did you observe when you
18   looked in the car as you drove by?
19   A.   We didn't -- my focus wasn't to look inside the vehicle
20   that we believed had conducted a drug transaction.  We were
21   focused on the other parties, the other subject who had walked
22   to the other vehicle, who flipped -- who did a U-turn, who
23   conducted a U-turn on Salem Street.
24   Q.   Isn't it a fact, sir, that the law enforcement agents lost
25   the person -- the guy got out of the car, and he was
```

1    immediately lost by law enforcement, correct?

2    A.    Once the vehicle conducted a U-turn, my assumption,

3    because 495 is right there, yes, the agents had lost the

4    vehicle.

5    Q.    Well, they lost the passenger; they lost the guy on foot.

6    They never -- can you show me any report that any of your

7    officers saw that passenger get back into the Buick?

8    A.    Saw the passenger?

9    Q.    Yeah.

10:09 10    A.    I observed the passenger get inside of the vehicle, and

11    the vehicle did -- conducted a U-turn.

12    Q.    Is that written in any report anywhere, sir?

13    A.    No, I don't believe it is, but that was my observation.

14    Q.    That's what you're telling us here today:  That you saw

15    the guy get into the Buick, and you saw this Buick drive away?

16    A.    That is my testimony.

17    Q.    Did you run the plate on the Buick?

18    A.    No, we did not.

19    Q.    Why not?

10:10 20    A.    Sometimes that stuff happens really fast.  I wasn't able

21    to get a plate.

22    Q.    There were five cars, by your admission, and a dozen

23    officers in this neighborhood, and you're telling me that not a

24    single one took down the plate?

25             THE COURT:  No.  He's telling us that he did not.

BY MR. KELLY:

Q.   Well, you have radio transmission with all the other cars, correct?

A.   A broken radio system.

Q.   Did anybody run the plate on this Buick?

        MR. PANICH:  This is asked and answered.

        THE COURT:  If he knows, he can tell us.  If he doesn't --

A.   Nobody ran a plate.

10:10 BY MR. KELLY:

Q.   Law enforcement lost the passenger and lost the Buick?

A.   Correct.

Q.   Persons that they believed were just involved in a drug transaction, poof, vanished, correct?

A.   Yes.

Q.   And you said that you believed that a drug transaction had taken place inside the vehicle.  But isn't it a fact, sir, you didn't observe any drug transaction take place, did you?

A.   No.

10:11 Q.   You are making a series of assumptions, correct?

A.   No.

Q.   So the Kia stays put, idling.  You drive by.  You take a turn and do a U-turn of some -- at some point.  And at that point the Kia drives away, correct?

A.   Correct.

1    Q.    It doesn't drive away at a high rate of speed, correct?

2    A.    No.

3    Q.    Doesn't violate any laws, speed limit or otherwise?

4    A.    No.

5    Q.    The driver is wearing a seat belt?

6    A.    I don't --

7    Q.    There's no motor vehicle violation being perpetrated by

8    that Kia that would allow you to stop it; fair to say?

9    A.    There was no motor vehicle infraction.  It was stopped

10:11 10   based on the reasonable suspicion of a criminal enterprise

11   taken within the car.

12   Q.    Now, when you drove away and drove by this car, you're in

13   an unmarked police vehicle, correct?

14   A.    Correct.

15   Q.    You and your partner are in plain clothes, right,

16   plainclothes?

17   A.    Yes.

18   Q.    You are not in uniforms?

19   A.    Yes.

10:12 20   Q.    You stare into the car of this person as you're passing

21   by, and then you pull up around the corner, correct?

22   A.    You just keep on reiterating that we stared inside the

23   car.  And nobody stared at the car, inside the vehicle.  So

24   we --

25   Q.    You drove by?

1          THE COURT:  Hold it, please.

2   BY MR. KELLY:

3   Q.   You drove by the car at a close distance and didn't bother

4   to look?

5   A.   My observations were of the secondary party who had gained

6   access into the passenger's.  We were trying to figure out

7   where he was going.

8   Q.   Okay.  So the Kia drives away.  You actually, after you

9   turned -- took a right on Osgood Street, you did a U-turn, and

10:12 10   you went back towards the market; did you not?

11   A.   Negative.

12   Q.   Where did go?

13   A.   We followed the Kia away.

14   Q.   Well, isn't it the case, sir, that you first took a

15   U-turn, and you went back towards the market.  The Kia took a

16   right-hand turn at one of the next stop signs.  And then you

17   took another U-turn, and at a high rate of speed you came up

18   behind the Kia?

19   A.   I don't recall that exactly.

10:13 20   Q.   When you finally had to make contact to follow that Kia,

21   isn't it a fact, sir, that you had to drive your undercover

22   vehicle at a high rate of speed to catch up to the Kia because

23   it had gone a fair distance ahead of you?

24   A.   There's no truth to the high rate of speed at all.

25   Q.   Okay.  And you pulled right up on the bumper of the Kia

1    with your vehicle?

2    A.   Correct.

3    Q.   At close proximity?

4    A.   When we got to the area of Blanchard and Parker Street, I

5    can say that we were definitely close to the Kia --

6    Q.   And --

7    A.   -- which probably is what got his attention.

8    Q.   And you claim that you were able to make certain

9    observations of suspicious movements inside the car; is that

10   your testimony?

11   A.   Correct.

12           MR. KELLY:  Your Honor, if I could approach.  This is

13   D.

14           THE CLERK:  Yes.

15           (Defendant Exhibit D received in evidence.)

16   BY MR. KELLY:

17   Q.   Now, what color was that Kia, by the way?

18   A.   I believe it was black.

19   Q.   I am going to show you up on the screen here this

20   photograph, which is the same model Kia as indicated in the

21   various reports in this case.

22           THE COURT:  This is not the car that was involved?

23           MR. KELLY:  It's not the car, no.  This is from the

24   company.

25           THE COURT:  So this is a chalk?

1          MR. KELLY:  A chalk.

2    BY MR. KELLY:

3    Q.   Do you recognize that this is a Kia of the same model and

4    the type that you were following on that particular day, sir?

5    A.   It's a very bad representation of the Kia.

6    Q.   How is it a bad representation?

7    A.   Because I'm looking at a 2D image.  It's very, very

8    different when you're looking at something in a physical form.

9    And, also, if -- my assumption is, is that you're going to say

10:15 10   that I didn't see what was going on.  But you have got to

11   remember that the road that we were traveling on, we were at an

12   incline.  So I can very well see what's going on, at least with

13   the shoulders and the head, from the position that I was

14   driving at.

15   Q.   The difference between the Kia that you were following and

16   this Kia was the color.  That color was black.  This one is

17   white, correct?

18   A.   Yes.

19   Q.   But this is an accurate image of what a Kia looks like

10:15 20   when you're directly behind it as if you were following it in a

21   car, correct?

22   A.   I wouldn't be able to tell you unless I saw that vehicle

23   in comparison to this 2D image.

24   Q.   And you can see in this Kia that it has an elevated trunk,

25   a fairly narrow back window, headrests, and a number of things

1    that make it somewhat difficult to see into the cab of this

2    car; fair to say?

3    A.   It depends on what angle you're looking at it from.

4    Q.   It would be very difficult, would it not, sir, traveling

5    behind this car to determine what, if anything, the driver of

6    the car in front of you is doing?

7    A.   Based on the physical representation, no.

8    Q.   You want us to believe that you were able to determine

9    that there were suspicious or furtive gestures going on and

10:16 10    that somebody was staring at you through the -- not only the

11    rearview mirror but the side mirrors which don't even appear on

12    this car from behind?

13    A.   Yes.

14    Q.   Now, at some point and -- let me get the map back up here.

15    Does this map that we've been looking at show where this bridge

16    is?  Or is the bridge off this map, sir?

17    A.   No, it doesn't show it.

18    Q.   And this is a little -- kind of further back out, does

19    this map show where the bridge is?

10:17 20    A.   No.  I mean, it's not really clear enough for me to

21    answer.

22    Q.   Let me do this.

23          MR. KELLY:  If we could approach?

24          E.

25          (Defendant Exhibit E received in evidence.)

        1    BY MR. KELLY:

        2    Q.   Sir, I'm showing you what's been marked as Defense Exhibit

        3    E.  You can see there it says "Salem Street," and in the

        4    distance you can see a bridge.  Is that the bridge we're

        5    talking about?

        6    A.   Correct.

        7    Q.   So, first of all, let's talk about the bridge.  That is a

        8    bridge that has a metal trestle of some kind over the top of

        9    it, correct?

10:19  10    A.   Yes.

       11    Q.   Only one car can fit through going in either direction.

       12    There's not room enough for two cars to be side by side; fair

       13    to say?

       14    A.   Correct.

       15         THE COURT:  Which direction was the Kia and you

       16    driving in this picture at the time?

       17         THE WITNESS:  Your Honor, we were going in the

       18    opposite direction of where that vehicle is traveling.

       19         THE COURT:  So where it says "Salem Street," that was

10:19  20    the side of the street you were on?

       21         THE WITNESS:  Correct.

       22         THE COURT:  And so this end -- the bottom of the

       23    picture is the place from which you turned right, onto the

       24    bridge?

       25         THE WITNESS:  Correct, Your Honor.  I activated my

```
 1    lights when we were on Blanchard Street before we made this
 2    turn.
 3              THE COURT:  Okay.
 4    BY MR. KELLY:
 5    Q.   Are you aware of the fact that -- strike that.
 6              How confident are you, sir, that you activated the
 7    lights when you were on Blanchard Street just before you took
 8    this turn, as opposed to after you had taken the turn onto
 9    Salem Street?
10    A.   100 percent confident.
11    Q.   And have you read Special Agent Cacace's report regarding
12    the stop?
13    A.   I've reviewed it, yes.
14    Q.   And are you aware that he indicates that it was roughly
15    ten seconds or so before -- after the lights were activated
16    that the car pulled over?
17              MR. PANICH:  Objection.
18              THE COURT:  Well, he said it.  You know, I'll assume
19    he'll be on the stand and he'll tell us, but it doesn't --
20    BY MR. KELLY:
21    Q.   How many seconds do you think it was, sir?
22              THE COURT:  -- it doesn't affect the credibility of
23    this witness.
24    BY MR. KELLY:
25    Q.   From the time you turn on the lights, how many seconds was
```

1    it before the car pulled over?

2    A.    I would say double that.

3    Q.    Isn't it true, sir, that a responsible driver, if driving

4    the car heading in this direction towards this bridge, and

5    suddenly police lights get activated behind that person, that

6    it wouldn't be wise for that person to stop either on the

7    bridge or just before the bridge because he would impede -- he

8    or she would impede traffic?

9    A.    I would say, just based on this picture, a responsible

10:21 10   person would have immediately pulled over before they got to

11   the bridge.

12   Q.    That's your view.  But isn't, in fact, what happened here,

13   sir, that that car crossed over the metal bridge and then

14   immediately pulled to the right?

15   A.    After the bridge.

16   Q.    Right, immediately after the -- immediately after the

17   bridge it pulled to the right and stopped?

18   A.    That's where he stopped, yes.  Correct.

19   Q.    And at no time did he violate any traffic -- commit any

10:21 20   traffic violations, to your knowledge?  Correct?

21   A.    No motor vehicle infractions, no.

22   Q.    And you said that at that point you aggressively came

23   across the front of his car and blocked his car in, correct?

24   A.    I never said "aggressively."

25   Q.    Where did you park your car?

```
 1   A.   I parked it in front of him.

 2   Q.   Right.  At an angle?

 3   A.   Negative.

 4   Q.   You pulled in front of him and stopped?

 5   A.   We were directly in line with each other.

 6   Q.   Okay.  And then what happened, sir?  Tell us what happened

 7   next.

 8   A.   I approached the driver's side door.

 9   Q.   All right.  And where was Special Agent Cacace?

10   A.   On the passenger's side.

11   Q.   So you got out of either door and came straight back on

12   either side of the vehicle?

13   A.   Yes.

14   Q.   The doors of the car were closed?

15   A.   Correct.

16   Q.   The doors of the car were locked?

17   A.   Not that I know of.

18   Q.   Isn't it a fact, sir, that as you approached the car you

19   were yelling, "Turn the car off"?

20   A.   No.

21   Q.   You deny that?

22   A.   Yelling, no.

23   Q.   Speaking in a loud voice?

24   A.   Using my command presence, yes, maybe.

25   Q.   You exit your car.  You walk back towards the car, "Turn
```

```
 1    the car off," all right.  You're armed, carrying a gun in your
 2    waistband?
 3    A.    You can't see my gun.
 4    Q.    Are you carrying a gun in your waistband or not?
 5    A.    I am, but it's concealed.
 6    Q.    Agent Cacace is carrying a gun, as well?
 7    A.    Correct.
 8    Q.    You are in plain clothes?
 9    A.    Correct.
10    Q.    All right.  And you come up to the car, and the windows
11    are closed, as well?
12    A.    Yes.
13    Q.    And what's the next thing you do?  You bang on the window?
14    A.    No.
15    Q.    What's that?  You read the Miranda rights?
16    A.    We have a conversation at the door, so the door --
17    Q.    Wait a minute.  When you read the Miranda rights, did you
18    read the Miranda rights through the closed window?
19    A.    No.  The door is open.
20    Q.    Isn't it a fact, sir, you approach the car.  You yell,
21    "Turn the car off."  And then you try to open the doors and the
22    doors are locked?
23    A.    No, I don't remember that.
24    Q.    Okay.  You recall that the driver at that point put his
25    hands up and said, "Officers, what's this about?"
```

10:23  (line 10)
10:23  (line 20)

1    A.    No.

2    Q.    At the beginning of your interaction, isn't it a fair

3    statement, sir, that the driver pulls out his iPhone, says,

4    "Officer, I'm just reaching for my iPhone.  I want to record

5    this for the benefit or the safety of both of us"?

6    A.    This was after I confronted him with the facts.

7    Q.    He turns on the iPhone?

8    A.    Yes.

9    Q.    And places it on the console, angling it so that it takes

10   an image of him?

11   A.    At my request, yes.

12   Q.    Does your demeanor and approach and volume change once you

13   know you're being video recorded from what it had been before?

14   A.    No.

15   Q.    You're sure about that?

16   A.    I'm positive.

17   Q.    And you claim you gave him Miranda warnings.  My question

18   remains:  Did you do that through a closed window and a locked

19   door in a car?

20   A.    The door was open when I gave Miranda.

21   Q.    Was he seated in the car?

22   A.    Yes.

23   Q.    Your memory is, and I thought you said that you weren't

24   entirely sure about this, you said, "I believe I had the door

25   open, but I'm not sure."  You are not sure, are you?

```
 1    A.    The door was open, yes.

 2    Q.    Are you changing your testimony now, sir?

 3          THE COURT:  Hold it.  Hold it.

 4    BY MR. KELLY:

 5    Q.    You are changing your testimony?

 6    A.    No.

 7    Q.    You believe the door was open; but you're not 100 percent

 8    sure, are you, sir?

 9          MR. PANICH:  Asked and answered, Your Honor.

10:25  10          MR. KELLY:  I don't think it has been.

11          THE COURT:  He can answer it once more.  That's it.

12    BY MR. KELLY:

13    Q.    Isn't it a fact that you are not 100 percent sure whether

14    the door was open or not?

15    A.    The door was open.

16    Q.    So you are changing your testimony?

17          MR. PANICH:  Objection.

18          THE COURT:  The objection is sustained.

19    BY MR. KELLY:

10:25  20    Q.    So you're approaching this car with this occupant who, up

21    to this point, has been cooperative, right?

22    A.    Yes.

23    Q.    All right.  And you claim that -- at that point you pull

24    out a card and start reading from a card; is that your

25    testimony?
```

A.    Yes.

          THE COURT:  Mr. Gonzalez, what was the sequence of

events?  He stopped.  You stopped in front of him, as I

understand it?

          THE WITNESS:  Correct, Your Honor.

          THE COURT:  And the door was closed, and the window

was closed?

          THE WITNESS:  Yes.

          THE COURT:  And what happened then?

          THE WITNESS:  The interaction took place -- I opened

the door, or he opened the door.  The door was open; I know

that with certainty.

          THE COURT:  The door was open when?

          THE WITNESS:  When we were engaging in conversation.

So I read my Miranda.  I --

          THE COURT:  No.  Before we get to the Miranda, you got

out of your car?

          THE WITNESS:  Correct.

          THE COURT:  He remained in his car?

          THE WITNESS:  Yes.

          THE COURT:  And then what happened?  You walked back?

          THE WITNESS:  I walked right to the driver's side of

the vehicle.

          THE COURT:  And then what happened?

          THE WITNESS:  And then the door was opened.

```
  1              THE COURT:  By whom?

  2              THE WITNESS:  Honestly, Your Honor.  I could have

  3     opened it.  He could have opened it.  All I know is that the

  4     door was opened when we engaged in conversation, and it was a

  5     very civil conversation between both of us.

  6              THE COURT:  Okay.

  7     BY MR. KELLY:

  8     Q.   You didn't know this person?

  9     A.   No.

10:27 10    Q.   You didn't make any observations of any kind of a weapon?

 11     A.   No.

 12     Q.   He was being polite and civil to you?

 13     A.   Yes.

 14     Q.   And at some point the entirety of what was transpiring was

 15     being recorded on an iPhone, correct?

 16     A.   Yes.

 17     Q.   And it's your testimony that you then directed him out, to

 18     get out of the car?

 19     A.   Correct.

10:27 20    Q.   And he complied?

 21     A.   Yes.

 22     Q.   And you immediately grabbed him by the waistband?

 23     A.   Yes.

 24     Q.   And so I would be correct, sir, at that point that he was

 25     not free to leave?  You were not going to let him walk away?
```

1          MR. PANICH:  Objection.  He's making a legal

2    conclusion.

3          MR. KELLY:  No.  No, I'm not.

4          THE COURT:  He can tell us what his intention was at

5    the time.

6    BY MR. KELLY:

7    Q.   You grabbed him by the waistband because you didn't want

8    him to run off.  You didn't know this guy?

9    A.   Yes.

10:28 10   Q.   He was not free to leave?

11   A.   No, he wasn't free to leave.

12   Q.   Okay.  You were with your partners who were both there and

13   armed and shortly thereafter joined by at least two other

14   officers who were also armed?

15   A.   Correct.

16   Q.   And at some point, still holding onto his pants, you

17   escorted him to the rear of the vehicle?

18   A.   Correct.

19   Q.   And you directed Special Agent Cacace to search the car?

10:28 20   A.   I didn't direct him to search the car, no.

21   Q.   He searched the car on his own?

22   A.   You'd have to ask Agent Cacace.

23   Q.   I will, but I'm asking you.  Did he search the car on his

24   own?

25   A.   No.  Not while we were both standing there, no.

1    Q.   Isn't it a fair statement, sir, that what transpired was

2    that Special Agent Cacace, while you were escorting Mr. Jimenez

3    to the back of the vehicle, jumped in and did a search of the

4    vehicle and found only two -- the two cell phones?

5    A.   That's not factual, no.

6    Q.   What's factual?  Tell me what it is.

7    A.   Well, while he was sitting there, he got out of the

8    vehicle.  After he was moving towards his lap, when he got out,

9    I held onto his waistband while I escorted him to the back of

10:29 10    the vehicle.  Based on the fact that we were investigating a

11    drug investigation, I saw the phone on the passenger's seat,

12    and then we conducted our business at the back until all the

13    other agents started to filter in.

14    Q.   At some point, whether it was you or Agent Cacace, someone

15    took the two cell phones and brought them to the back of the

16    vehicle and placed them on the rear hood of the Kia, kind of

17    above where you see that title that says "Kia."  They placed

18    the two cell phones on the rear hood, correct?

19    A.   After we found the drugs?

10:29 20    Q.   No.  After you found the two cell phones in the car.

21    A.   Negative.  That's not my recollection.

22    Q.   All right.  So you would have left the cell phone in the

23    car?  You didn't remove the cell phone or Agent Cacace didn't

24    remove it and bring it to the back of the car?

25    A.   I don't know what Agent Cacace did.  I was dealing with

1    the subject.

2    Q.   Did you or Agent Cacace shut off the video that was

3    recording the event?

4    A.   I don't know.

5    Q.   So if the cell phone was placed on the back of the Kia and

6    removed from the car, it might have still picked up the audio

7    even if it didn't pick up the video?

8    A.   Maybe, but I don't know if it was turned on or off.

9    Q.   And, by the way, you say it's your standard practice --

10:30 10   when you approach a vehicle, the very, very first thing you do

11   is give the person the Miranda warnings; that's what you want

12   us to believe?

13   A.   Based on a drug investigation, yes, that's how we operate.

14   Q.   So you walk up and you tell the person, "Look, you don't

15   have to talk to me," right?  "You have a right to a lawyer," et

16   cetera, et cetera, et cetera.  "You don't have to talk to me."

17   That's what they teach you?

18   A.   It's not taught.  It's practice.  We actually give them

19   the benefit of the doubt by informing them of their Miranda,

10:31 20   giving them the facts of why we stop them.

21          And then most of the times, a lot of them will take

22   it from there.  And half of them tell us exactly what's going

23   on.  And half of them, we have to do a little more digging.

24   Q.   At the time that you are allegedly giving these Miranda

25   warnings when you walk up to the closed window, have you

1  already made a decision that you were going to arrest this

2  person right then and there, based on what you had?

3  A.   It depends on what we observe beforehand.

4  Q.   That's my question.  Based on what you observed at that

5  moment when you're reading the Miranda warnings, had you

6  already made a decision that this person was going to be

7  arrested?

8  A.   In this specific incident, no.  We knew that we had

9  stopped them --

10:31 10  Q.   So even though --

11        THE COURT:  Hold it, Mr. Kelly.

12  BY MR. KELLY:

13  Q.   So even at that moment --

14        THE COURT:  Let him finish the answer first.

15        MR. KELLY:  I thought he had.

16        THE COURT:  No.

17  BY MR. KELLY:

18  Q.   Did you want to say something else?

19  A.   We knew we had stopped him because we had reason to

10:32 20  believe that a drug transaction had taken place inside of the

21  vehicle.

22  Q.   So you believed but you didn't have evidence that would

23  have sustained an arrest or prosecution at that point?

24  A.   Not at that point, no.

25  Q.   So at the time you're allegedly giving these Miranda

    1    warnings, you knew that you did not have a legitimate basis to

    2    arrest this person?

    3            MR. PANICH:  Objection.

    4            THE COURT:  I don't know that he said that at all.

    5    BY MR. KELLY:

    6    Q.   You didn't have a basis to arrest the person at the time

    7    you gave him the Miranda warnings; isn't that what you just

    8    told us?

    9            MR. PANICH:  Objection.

10:32 10           THE COURT:  He can tell us again.

   11    BY MR. KELLY:

   12    Q.   Go ahead.

   13    A.   We were conducting an investigation based on a 94C

   14    violation.

   15    Q.   I understand what you were conducting.  My question is a

   16    simple one.  At the moment you are reading the Miranda

   17    warnings --

   18    A.   Yes.

   19    Q.   -- was it your intention to place this person in the car

10:32 20   under arrest?

   21    A.   The intent wasn't -- the intent was to determine if a drug

   22    transaction had actually taken place before we decide whether

   23    or not we have probable cause, yes.

   24    Q.   Follow my question.

   25            THE COURT:  I think he's answered it.

A.   I can't answer yes or no to that because it depends on
where the investigation takes us.
BY MR. KELLY:
Q.   At the moment that you gave the warnings, you did not have
enough --
         THE COURT:   I think he has answered that question.
         MR. KELLY:   Okay.  I'll move on, Your Honor.
         THE COURT:   How much more do you have?
         MR. KELLY:   Just a couple minutes, Your Honor.
         THE COURT:   I should have asked earlier.
BY MR. KELLY:
Q.   Now, up to that point, you had no reason to believe that
this person that you -- was being cooperative with you at the
side of the road was a danger to you?  You had him by the
pants, right?  You escorted him to the back, right?  You had
not seen any kind of a weapon.  There was no indication that
this person was armed or dangerous?
A.   The indication for us was that there was a lot of movement
within inside the vehicle.  So there was a potential threat
until we patted him down.
Q.   So you had him by the thing -- by the pants.  You patted
one side of his pants -- by the way, what kind of pants was he
wearing; do you remember?
A.   They were skins.  They were pretty tight.
Q.   Isn't it a fair statement, sir, that he was wearing fairly

1    loose fitting, what we call cargo pants, green in color?

2    A.   I just answered that they were tight pants.  They are

3    skinny cargo pants.

4    Q.   You're sure about that?

5    A.   Yes.

6    Q.   And photographs and other processing documents would back

7    you up on that, sir?

8             MR. PANICH:  Objection.

9             THE COURT:  The objection is sustained.

10:34 10   BY MR. KELLY:

11   Q.   You felt something which you told us turned out to be lip

12   balm?

13   A.   Yes.

14   Q.   And at that point, you asked your partner to do a pat

15   frisk of the subject?

16   A.   I didn't ask anybody to do a pat frisk.

17   Q.   Did Special Agent Cacace conduct a pat frisk of the

18   subject?

19   A.   He may have after that fact but not then and there.

10:35 20   Q.   While you're standing there by the back of the car, isn't

21   it so, sir, that Special Agent Cacace patted him down, found

22   some quantity of money, and then otherwise said to you he's

23   clean?  Isn't that what happened?

24   A.   I don't recall that.

25   Q.   You don't recall that?

A.    No.

Q.    And do you recall directing Special Agent Cacace to pat

him down a second time?

A.    No.

Q.    You had patted him down once to find this little lip balm

thing, and you didn't find any indication of a weapon, right?

A.    I wasn't done with the pat frisk.  I stopped at that,

addressed it, and then I moved on from there.

Q.    At no time, whether it was in your first pat frisk or your

second pat frisk, did you feel anything that indicated to you

that it was a firearm, a gun?

A.    No.  Again, I addressed everything that -- I stopped at

everything that I needed to question.

Q.    So you didn't feel a gun, correct?

A.    Not yet, no.

Q.    You didn't feel a knife?

A.    No.

Q.    During your two pat downs, you didn't feel anything which

indicated to you was a weapon?

A.    All I felt was a lip balm and then the other object.

Q.    Right.  And the other object which you described, as you

were patting this person in his groin area, I think your

testimony was that you felt an object that was weird, that was

out of place, and that was an odd object.  Is that what your

testimony was?

1    A.    Yes.

2    Q.    So not a gun, not a knife, but an odd object, correct?

3    A.    Correct.

4    Q.    So you decide rather than conduct a pat frisk, now you're

5    going to do an all-out search and reach into his underwear and

6    his groin area and find whatever this odd object is, correct?

7    A.    After the statement, yes, we decided that we wanted to

8    search it.

9    Q.    Your testimony is that -- and, of course, we all know why

10:36 10   the sequence is that you want us to believe --

11              MR. PANICH:  Objection.

12              THE COURT:  Can we just have a question, Mr. Kelly,

13   without embroidering?

14   BY MR. KELLY:

15   Q.    You believed that what was in his underwear was drugs,

16   correct?

17   A.    Correct.

18   Q.    The odd object you did not believe was a weapon; you

19   believed it was some form of drugs?

10:37 20   A.    Based on the investigation, yes, I believed it was drugs.

21   Q.    And, in fact, it was not Officer Reardon, sir, but, in

22   fact, it was you who donned a protective glove of some kind and

23   reached into his pants to remove the object?

24   A.    No.

25   Q.    You deny that?

```
 1    A.    It was Detective Reardon who put on a blue glove.

 2    Q.    Well, before you said, "I believe it was Detective

 3    Reardon."  You're not sure?

 4    A.    It was Detective Reardon who put on --

 5    Q.    So you are changing your testimony again?

 6          MR. PANICH:  Objection.

 7          THE COURT:  I don't remember what he said before.

 8    BY MR. KELLY:

 9    Q.    Well, he said, "I believe it was Special Agent Reardon"

10    who reached into the pants, but you're not sure?

11    A.    I'm pretty positive that it was Detective Reardon who

12    pulled the item out from in between.

13    Q.    And then you started to say, before you were cut off by

14    Counsel, that at that point you made the statement, "The jig's

15    up."  Did you say something like that?

16    A.    Yes.

17    Q.    And --

18    A.    It was something to that effect.

19    Q.    So, in other words, you reached -- or somebody reaches

20    into the crotch area -- by the way, when they try to undo this

21    subject's pants, does he object?

22    A.    No.

23    Q.    What do you recall?  He willingly allowed him to just

24    reach into his pants?

25    A.    I would call it an admission of guilt.  He was defeated
```

10:38 (line 10)
10:38 (line 20)

1   after I confronted him, and then he pulled the drugs out.

2   Q.   Listen to my question.

3        Did someone ask permission to undo his pants and

4   reach into his underwear?

5   A.   We informed him that we were going to recover the item,

6   yes.

7   Q.   And how did he respond?

8   A.   He just shook his head.

9   Q.   Meaning what?  Shook it up and down?

10:39 10   A.   He shook it in defeat because he knew that we had

11   basically figured out what had occurred.

12   Q.   Isn't it a fact, sir, that he resisted the notion that you

13   were going to reach into his underwear.  And then,

14   notwithstanding either you or Reardon, reached into his

15   underwear and pulled something out.  And at that point, you

16   said, "The jig's up"?

17        MR. PANICH:  Objection.

18   BY MR. KELLY:

19   Q.   Isn't that what happened, sir?

10:39 20   A.   No.

21        THE COURT:  He can tell us whether that's what

22   happened.

23   A.   No, it did not.

24   BY MR. KELLY:

25   Q.   In other words, at that point -- it was no longer a pat

frisk.  When somebody reached into his underwear, that's a

full-blown search.  You're not going after a gun.  You're going

after an odd object or something that felt weird or out of

place?

                MR. PANICH:  Your Honor, I'm not sure what the

question is here, but the first part is a legal conclusion that

he was asking for.

                THE COURT:  Let's have a simple question.

BY MR. KELLY:

Q.   At that point when someone is reaching into his underwear,

that's not a pat frisk, is it, sir?

                MR. PANICH:  Objection.

                THE COURT:  The objection is sustained.  I'll have to

decide that.

BY MR. KELLY:

Q.   The purpose of reaching into the underwear was to pull out

whatever you believed was a weird object, right?

A.   Yes.

Q.   And the weird object certainly was not a gun or a knife?

A.   It was illegal contraband.

Q.   It was drugs?

A.   Yes, after the statement was made.

Q.   It was a search for evidence, correct?

A.   Yes.

                MR. KELLY:  Nothing further.

```
 1              THE COURT:  Any redirect?

 2              MR. PANICH:  Briefly, Your Honor.

 3              THE COURT:  Well, if there's any redirect, there's

 4    going to be recross.

 5              MR. PANICH:  I'll try to avoid that on the scope, Your

 6    Honor.  Are the exhibits still --

 7              MR. KELLY:  No.

 8              MR. PANICH:  Keep your eye on those.  I don't need

 9    them now.

10                      REDIRECT EXAMINATION

11    BY MR. PANICH:

12    Q.   Have you ever felt drugs, Detective Gonzalez?

13    A.   Yes.

14    Q.   And how, if at all, was the weird object that you felt

15    consistent with what you previously felt was drugs?

16    A.   It had a lot of similar properties from the -- just by

17    feeling it from the outside.

18    Q.   Do you recall questions from Mr. Kelly regarding what he's

19    previously marked as D for identification?

20    A.   Yes.

21    Q.   Can you tell from this photograph or two-dimensional

22    image, as you put it, what the vantage point the

23    photographer -- they said it's an actual photograph -- is using

24    to capture the image of the Kia?

25    A.   It looks like the angle of that shot is a lot lower than
```

1    one from, you know, from another angle would see it.

2    Q.   What kind of car were you driving on the day of July 10 of

3    last year?

4    A.   I was driving a Honda Accord.

5    Q.   And what was the angle in which you were viewing the Kia

6    from behind?

7    A.   I would say at points it was parallel but also above, just

8    based on some of the streets that we were on.

9    Q.   Even in this photo, what do you notice right here where

10:42 10   I'm displaying right now?

11   A.   The rearview mirror.

12   Q.   Do you recall questions earlier about the passenger and

13   what he was wearing?

14   A.   Yes.

15   Q.   And you testified that he was wearing a flannel shirt?

16   A.   Yes.

17   Q.   In your experience investigating drug trafficking in

18   Lawrence -- well, first of all, I will ask a different

19   question.

10:42 20          Why is Lawrence the focus of drug activity?

21          MR. KELLY:  Objection.  I don't know how that's

22   relevant.

23          THE COURT:  Why is Lawrence what?

24          MR. PANICH:  A focus of drug activity.  It gets to the

25   point of -- well, I don't want to --

```
         1              MR. KELLY:  Objection.

         2              MR. PANICH:  Let me see if I can lay a little more

         3      foundation.  You know what?  I'm going to leave it.

         4              I don't have anything further.

         5              THE COURT:  Any recross?

         6              MR. KELLY:  No, Your Honor.  I'm all set.

         7              THE COURT:  Okay.  Thank you, Mr. Gonzalez.  You're

         8      excused.

         9              How many more witnesses do we have, and how much time

10:43   10      will they take?

        11              MR. PANICH:  So just one for the Government.  That's

        12      Special Agent Cacace.

        13              MR. KELLY:  And we have one that will be five minutes,

        14      tops.

        15              THE COURT:  Okay.  Why don't we take a brief recess,

        16      and we'll finish before the witching hour, right?

        17              MR. PANICH:  I believe so, Your Honor.

        18              THE COURT:  Okay.  So we'll take a recess.

        19              (Recess taken from 10:44 to 11:02 a.m.)

11:02   20              (Witness sworn.)

        21              THE WITNESS:  I do.

        22              THE CLERK:  Sir, may I ask you to please speak into

        23      the mic and state your name, spelling your last for the record,

        24      please, sir.

        25              THE WITNESS:  My name is Gary S. Cacace, C-a-c-a-c-e.
```

1          THE CLERK:  Thank you.

2          GARY S. CACACE, having been duly sworn by the Clerk,

3     was examined and testified as follows:

4                          DIRECT EXAMINATION

5     BY MR. PANICH:

6     Q.   Good morning, Supervisory Special Agent Cacace.

7     A.   Good morning.

8     Q.   What's your current position?

9     A.   I'm currently a supervisory special agent with the Federal

11:03 10    Bureau of Investigation assigned to -- technically assigned to

11    headquarters in Washington, D.C., as the organized crime drug

12    enforcement task force coordinator, but I sit physically here

13    in New England in Boston.  I'm responsible for the New England

14    area.

15    Q.   How long --

16          THE COURT:  So are you a coordinator?  Or part of the

17    task force that is the subject of this case?

18          THE WITNESS:  I am a coordinator.

19          THE COURT:  But does that mean that you go out into

11:03 20    the field?

21          THE WITNESS:  On occasion.  I'm still responsible as a

22    special agent for enforcing the same laws that any other

23    special agent or federal task force officer would be

24    responsible for.  I still have those duties.

25          THE COURT:  Did you run this particular task force?

1          THE WITNESS:  I was not in charge of this particular

2     task force, no.

3          THE COURT:  Just a member of it?

4          THE WITNESS:  Exactly.  A temporary member on certain

5     days.

6     BY MR. PANICH:

7     Q.   How long have you served in the FBI?

8     A.   28-and-a-half years.

9     Q.   And during how much of that time, approximately, have you

11:04 10    served in a supervisory capacity?

11    A.   Probably about nine years in total.

12    Q.   What experience do you have in investigating narcotic

13    offenses?

14    A.   As either an investigator or a supervisor, I probably have

15    about 11 years of that 28 years involved in narcotics

16    investigations, albeit some of them not full time.  When I was

17    a supervisor, I had other responsibilities for other violations

18    within the FBI.

19    Q.   What was Operation Devil's Highway?

11:04 20    A.   Operation Devil's Highway was an OCDETF-funded strategic

21    initiative which was designed to target drug distribution

22    emanating from the vicinity of greater Lawrence, Massachusetts.

23    It started in the summer of -- late spring, early summer of

24    2019.

25    Q.   Why was Lawrence a focus of the Bureau's attention?

A.   For the last several years, the FBI, as well as our
federal and state and local counterpart law enforcement
agencies, were aware of drugs being purchased in Lawrence by
either end users or small- to mid-level drug dealers from
Massachusetts, New Hampshire, Maine, at least to name those
three states.

Q.   Any particular reason why, in your opinion, Lawrence has
become a focus of drug activity?

       MR. KELLY:  Objection, Your Honor.  I don't think this
is -- his opinion on -- I don't know how this --

       THE COURT:  As supervisor, he can tell us.

A.   There are several reasons.  Economic conditions
potentially.  But one thing that seems to -- it's a city that
sits on -- between Route 93 and 495 with exits, and it makes it
fairly accessible from those places that I just described:  The
seacoast, and Maine, New Hampshire, as well as northern New
Hampshire or central New Hampshire, and Massachusetts.

BY MR. PANICH:

Q.   What role did you play in Operation Devil's Highway?

A.   I was out as a member of one of the teams, of the various
teams that were sent out there.  On any given day there were
seven to ten teams of maybe eight to ten law enforcement
officers.  And so on the days that I was out, I would join a
particular team.

Q.   So what was your assignment on -- or what were you doing

 1    on July 10th of last year?

 2    A.    I was assigned with members of the Lowell resident

 3    agency -- special agents with the Lowell resident agency as

 4    well as task force officers from that office, FBI task force

 5    officers, as well as detectives from North Andover, Lawrence.

 6    And, specifically, I was riding with Detective Radames Gonzalez

 7    from the Lawrence Police Department.

 8              THE COURT:  Does the Lowell resident agency take care

 9    of Lawrence?

11:07 10              THE WITNESS:  It does, yes.

 11   BY MR. PANICH:

 12   Q.    I put on the screen what's been previously admitted as

 13   Exhibit 1, and I'll direct your attention to Osgood Street here

 14   and Portland Street here (indicating).  What did you see in

 15   that vicinity around 5:00 p.m. on the 10th?

 16   A.    Somewhere in the vicinity, I think it was actually closer

 17   to Osgood and Market, we observed a dark-colored -- I thought

 18   it was either brown or blue -- Buick automobile, older style

 19   Buick automobile, occupied by two white males that was

11:07 20   traveling around the area, at least around that area.

 21   Q.    Who, if anyone, did you see exit the Buick?

 22   A.    Ultimately after a very short time --

 23              THE COURT:  Excuse me.  Before you get to that, can

 24   you tell us -- were you alone in the car or with somebody else?

 25              THE WITNESS:  No.  I'm sorry.  I was with Detective

1   Gonzalez.  Detective Gonzalez was driving.  I was the

2   passenger, and we had been out since probably around noontime

3   on --

4           THE COURT:  And where on this map were you --

5           THE WITNESS:  I don't think it's --

6           THE COURT:  -- when you were driving around?

7           THE WITNESS:  We were in this whole area.  But when we

8   specifically saw the Buick, it was in the vicinity of Market

9   and Osgood.  This area was an area that we had -- at various

11:08  10  times during the day were kind of patrolling, for lack of a

11  better word, because the Lawrence Police Department was aware

12  that this was an area that had been used for drug activity or

13  reported drug activity.  On prior days, I think we were

14  actually there, as well, in that area, prior days of this

15  initiative.

16          THE COURT:  Thank you.

17  BY MR. PANICH:

18  Q.   So who, if anyone, did you see exit the Buick?

19  A.   An unknown white male, who still remains unknown to this

11:09  20  day, exited the passenger's side of the Buick in the vicinity

21  of Market and Osgood, and then that person walked up Osgood

22  Street in the direction of Portland.

23  Q.   And where did he go after that?

24  A.   Ultimately, on foot, he went in -- there was a black Kia

25  automobile on Portland, I believe near the intersection of

1    Osgood -- and the unknown subject got into the passenger's side

2    of that vehicle.

3    Q.   And then what did you do in response to that?

4    A.   We observed -- put it out on the radio for the other units

5    that were out with us, like I said, maybe four or five other

6    cars.  And we were -- I think we ended up on Portland Street,

7    and that vehicle traveled, the Kia -- we didn't have it under

8    observation.  I didn't have it under my line of sight

9    completely the whole time, I don't think.

11:10 10          But we ended up seeing it again down in the vicinity

11   of Market and Loring Street.  And it continued down Loring

12   Street towards, I guess in a southeasterly direction -- I don't

13   see a map -- I mean, in a southeasterly direction until it came

14   to the intersection of Salem Street.

15   Q.   And what did you observe at that intersection?

16   A.   It made a right on Salem Street, which I guess it would

17   make it pointed in a westerly direction, and the passenger of

18   that vehicle got out of the Kia, the unknown passenger.

19   Q.   What, if anything, did you do to apprise the rest of your

11:11 20  team about the passenger that --

21   A.   I put that out on the radio, as well as a -- we observed

22   the Buick, the original Buick that we teed off of, in the

23   vicinity of Loring and Salem Streets.  I put that out to the

24   other officers and agents.

25   Q.   What was your goal in doing that?

A.   I wanted the -- we believed we were observing a drug

transaction, based on the short duration.  I wanted other

officers to follow the Buick and ultimately stop that Buick and

discuss what had happened with the passenger and driver while

Detective Gonzalez and I focused on the Kia.

Q.   Were other officers able to locate the Buick?

A.   They were not.

Q.   I want to skip ahead a little bit, to save time, to a

period when you stopped the Kia.  Can you describe what

happened when you stopped the Kia?

A.   Initially, the Kia did not stop.  It was on Salem Street.

I believe it's Salem Street, near a bridge, what's known as the

Nyhan Bridge.  I don't think it was on that map.

There was heavy traffic on the bridge.  It appeared

that the driver of the Kia was looking around in his rearview

mirror.  And before it got to Salem Street, it pulled over on a

street we were traveling, which I believe now would be

Blanchard Street.  It pulled over slightly like it was going to

stop on Blanchard Street.  We were behind it, kind of forced us

to stop a little bit, and then it pulled into traffic again and

continued on in its direction, ultimately turning right onto

Salem Street.

Both Detective Gonzalez and I believed that the

driver of the Kia was -- had made us, even though we were in a

Honda Accord, not traditionally a law enforcement -- known law

1      enforcement vehicle.  We felt that he had probably seen us a

2      few times during this encounter and believed we were law

3      enforcement officers.

4              So as we turned onto Salem Street in the vicinity of

5      the Nyhan Bridge, Detective Gonzalez told me he was going to

6      stop the vehicle and activated the blue lights and the siren in

7      the Lawrence unmarked vehicle.

8      Q.   So after you stopped the Kia, at some point did Officer --

9      excuse me, did Detective Gonzalez ask the driver to step out of

11:13 10   the vehicle?

11     A.   He did.

12     Q.   And, by the way, do you recognize the driver in court

13     today?

14     A.   Yes.  It's the gentleman sitting with the plaid jacket

15     between counsel.

16              MR. PANICH:  And, once again, I'd ask the record to

17     reflect the witness identified the defendant.

18              THE COURT:  Yes.

19     BY MR. PANICH:

11:14 20   Q.   What were you doing as Detective Gonzalez -- well, back

21     up.

22              Who was the person who was primarily asking questions

23     of the defendant?

24     A.   Detective Gonzalez.  He was on the driver's side of the

25     vehicle.

```
 1   Q.   And what were you doing while he was asking the questions?
 2   A.   I was on the passenger's side of the vehicle, watching for
 3   officer safety to make sure that we were -- that the driver
 4   wasn't doing anything that made us concerned or would cause us
 5   any harm.
 6   Q.   Why would you be concerned about officer safety in a
 7   situation like this?
 8   A.   In drug transactions, it's been my experience that drug
 9   dealers often carry firearms, often take firearms in trade for
 10  drug activity for -- in exchange for drugs.
 11       I was aware of a separate and completely independent
 12  investigation that our gang task force was undertaking in
 13  Lawrence at the time where they had bought between 50 and 70
 14  guns by that point from known gang and drug traffickers.  So
 15  that was on the back of my mind.
 16       Any time we're involved in drugs, we believe that
 17  guns could be involved because they have been in the past.
 18  Q.   At some point did the defendant take out his iPhone?
 19  A.   He did.
 20  Q.   And what did he do with it?
 21  A.   He told Detective Gonzalez and me, I guess, that he wanted
 22  to record this.  I believe the words he said was, "I want to
 23  record this for my safety."  And he put the iPhone with his
 24  right hand in the console area that would be the divider
 25  between the seats in the Kia and put it up near where, like
```

1   maybe under the radio or heater system in the car.

2   Q.   When the defendant ultimately exited the Kia, did he take

3   the phone with him?

4   A.   I believe that that phone sat there the entire time that

5   we were in the stop.

6   Q.   Once he was out of the car, what did you do?

7   A.   Brought him to the back of the vehicle.  I joined -- I

8   knew Officer Gonzalez was taking him out of the car.  He

9   actually might have -- I can't recall whether he told me he was

11:16 10   taking him out or when he told Mr. Jimenez that he was taking

11   him out, I went to the driver's side of the Kia, and then we

12   brought Mr. Jimenez back to the trunk area of the Kia.

13   Q.   And what did you do relative to Mr. Jimenez?

14   A.   I searched his right side.  I patted his right side down

15   and --

16   Q.   Can you explain why you patted the right side?

17   A.   Because Detective Gonzalez felt the need to take him out

18   of the car.  In fact, when he took him out of the car, he may

19   have said words to the extent that he's reaching around.  It

11:16 20   appeared that he was reaching -- to Gonzalez that he was

21   reaching with his left hand under his seat, and it turned

22   out --

23   Q.   When -- sorry.

24       Was anyone patting him down on the left side?

25   A.   Detective Gonzalez.

1   Q.   So you were patting him down on the right side?

2   A.   Yes.

3   Q.   When you patted his pocket, what did you feel, if

4   anything?

5   A.   I felt a bulge, which wasn't hard, that I believe to be

6   currency or potentially currency and narcotics.

7        THE COURT:  Excuse me.  Did both of you pat him down

8   at the same time?

9        THE WITNESS:  I can't recall, Your Honor.  It was

11:17 10   pretty close to being contemporaneous.  I didn't pat him down

11   on the left side at all because I was standing to his right,

12   right rear, and Detective Gonzalez was kind of standing to his

13   left.  So I didn't reach across his front to take his left

14   side, no.  If it wasn't at the same time, if it wasn't

15   simultaneously, it was close -- in close duration to it.

16        THE COURT:  Thank you.

17   BY MR. PANICH:

18   Q.   After having felt what you said, I think, was consistent

19   with U.S. currency, what did you do?

11:18 20   A.   I removed the currency and put it on the trunk of the car.

21   Q.   What, if anything, did Detective Gonzalez say at that

22   point to the defendant?

23   A.   He said, "What's this?"

24   Q.   Do you remember exactly those being his exact words?

25   A.   Something to the effect of, "What's this?"  I can't recall

```
 1    his exact words.  He had found a ChapStick in his left pocket.
 2    Q.    Okay.  Did he feel anything else?
 3    A.    He did, and I think that's why he had said, "What's this?"
 4    Q.    What was the response from the defendant?
 5    A.    Words to the effect of, "It is what it is."
 6    Q.    And at that point what happened?
 7    A.    Detective Gonzalez told me to pat him down again, which I
 8    continued with the side that I did.  I did not -- I do not
 9    recall patting down Mr. Jimenez's crotch.  I believe Detective
10    Gonzalez patted down his crotch because he felt something from
11    his side that I didn't feel from my side.
12    Q.    What did you think Detective Gonzalez had felt when --
13    after the defendant had responded, "It is what it is"?
14          MR. KELLY:  Objection, Your Honor.  I don't know how
15    he can answer that.
16          THE COURT:  I'm unclear about the sequence of events.
17    You patted down Mr. Jimenez on the right side?
18          THE WITNESS:  Yes.
19          THE COURT:  And you found money?
20          THE WITNESS:  Yes.
21          THE COURT:  Mr. Gonzalez patted him on the left side
22    and found what turned out to be a ChapStick?
23          THE WITNESS:  Yes.
24          THE COURT:  And when he found that ChapStick, what did
25    he say to you or to the defendant?
```

1    THE WITNESS:  I don't know which happened first, Your

2  Honor.  He said, "What is this?" to Mr. Jimenez, or he told me

3  to pat him down again.  But he never communicated to me during

4  that exchange that he felt something hard in his crotch.  It

5  was he said the words --

6    THE COURT:  Let me go back for a moment.  You said

7  that he asked Mr. Jimenez, "What is this?"

8    THE WITNESS:  Yes.  And that was after removing the

9  ChapStick from my --

11:20 10    THE COURT:  Right.  Before any further looking --

11  before any crotch?

12    THE WITNESS:  Yes.

13    THE COURT:  And what did the defendant say?

14    THE WITNESS:  "It is what it is."  Words to the effect

15  of, "It is what it is."

16    THE COURT:  Okay.

17  BY MR. PANICH:

18  Q.   After that statement and the pat frisk were complete, what

19  happened?

11:20 20  A.   I believe Detective Gonzalez found the drugs in

21  Mr. Jimenez's crotch area.

22  Q.   Do you remember who removed the item from the defendant?

23  A.   Yeah.  Detective Michael Reardon from North Andover Police

24  Department.

25    MR. PANICH:  Your Honor, I don't have any further

1    questions.

2              THE COURT:  Mr. Kelly?

3              MR. KELLY:  Yes, Your Honor.  If I could approach just

4    to give the witness a copy of Exhibit B, Your Honor, with the

5    Court's permission?

6              THE WITNESS:  Thank you.

7                        CROSS-EXAMINATION

8    BY MR. KELLY:

9    Q.   Good morning, Special Agent Cacace.

11:21 10             Fair to say, sir, that you were the senior officer in

11   your two-person tandem that day on July 10th?  You had far more

12   law enforcement experience than Detective Gonzalez?

13   A.   That is -- I had far more FBI experience.  As far as drug

14   interdiction on the side of a Lawrence policeman and detective,

15   I'm not sure.  I'm not sure.  He appeared as a very experienced

16   officer, as well, based on --

17   Q.   Did you know at that time how long he had been a

18   detective?

19   A.   I don't know if I knew then, or I don't know that I know

11:22 20  now.

21   Q.   Had you and he worked together previously prior to this

22   date on July 10th?

23   A.   I think we might have worked together one prior time.  I

24   just can't recall whether that was before or after this day.

25   Q.   So on July 10th, you told us that you were out at about

1  noontime patrolling for the afternoon?

2  A.    Yes.

3  Q.    Prior to 5:00?

4  A.    Yes.

5  Q.    Looking for suspicious activity?

6  A.    Specifically, suspicious narcotics activity, yes.

7  Q.    And I've placed before you a document which is three pages

8  long.  Do you recognize that, Special Agent Cacace?

9  A.    I do.

11:22 10  Q.    And that is your FBI-302.  That's the report that you

11  wrote in connection with the events of July 10th?

12  A.    Yes.

13  Q.    And am I fair -- am I accurate, sir, if you were just to

14  focus on the first paragraph there --

15          THE COURT:  This is not yet in evidence?

16          MR. PANICH:  Correct, Your Honor.

17          MR. KELLY:  I would offer it, Your Honor.

18          MR. PANICH:  For what purpose?

19          THE COURT:  Well, among other things, recorded

11:23 20  recollection.

21          MR. PANICH:  I think that only applies if he asserts a

22  failure of memory, if I'm not mistaken.  There hasn't been any

23  inconsistency that's been identified or any statement that he's

24  trying to challenge.

25          THE COURT:  But that's where he's going.

1          MR. KELLY:  Yes, Your Honor.

2          MR. PANICH:  I'd ask that he establish some foundation

3     about that, what he's trying to establish.

4          THE COURT:  It's his document.  He wrote it.

5          MR. PANICH:  Well, but it's still -- it's still not

6     prior testimony, so it's still hearsay.  It can be offered for

7     inconsistency purposes, but I don't think --

8          THE COURT:  At the moment, I think he's offering it to

9     both refresh recollection and to test his testimony.

11:23 10        MR. PANICH:  But he hasn't asserted a failure of

11    memory yet.  I just don't know that a foundation has been

12    asserted for that.  I don't have a problem of him using it for

13    those purposes, but I just ask if he is to lay a foundation.

14         THE COURT:  Okay.

15    BY MR. KELLY:

16    Q.   You wrote this perhaps with some assistance from Agent

17    Weidlich?

18    A.   Yes.

19    Q.   And when you wrote this report, you tried to be accurate?

11:24 20  A.   Yes.

21    Q.   And fair to say that the date you wrote this back in

22    September, your memory of the events of July 10th were better

23    than they are today?

24    A.   Yes.

25    Q.   Am I correct, sir, if I were just focusing on the first

1  paragraph, there are 13 different police officers who are

2  listed there who participated in some manner in the events of

3  July 10th?

4          MR. PANICH:  Again, Your Honor, this is not

5  inconsistent with anything that was said previously.

6          THE COURT:  He will tell us first how many there were

7  and if he doesn't know.  I mean, do you really want him to jump

8  through the hoops?

9  BY MR. KELLY:

11:24 10 Q.   Am I correct that there were approximately 13 officers

11  that are listed in your report that were participating that

12  particular day?

13  A.   Yes.

14  Q.   And I think, as you've already told us, sir, that there

15  were four or five vehicles that were involved with these

16  officers?

17  A.   I think that's probably about right.

18  Q.   So the first thing that happened, sir, is that at or

19  around 5:00, you observed this dark-colored Buick sedan?

11:25 20 A.   Correct.

21  Q.   And so that particular day, as you were patrolling, you

22  hadn't yet seen this Kia that was parked up on Portland Street.

23  It was the Buick sedan that caught your attention initially?

24  A.   It did, yes.

25  Q.   Okay.  And you were the passenger, as you told us, and

1   Detective Gonzalez was the driver, correct?

2   A.   That's correct.

3   Q.   And did you then -- did you drive your car, your

4   undercover car, up Osgood Street when you saw that Buick parked

5   there?

6   A.   I believe we did, yes.

7   Q.   And you saw the passenger of the Buick get out and walk up

8   the street?

9   A.   Yes.

11:25 10   Q.   And tell me what you did at that point.  As you are seeing

11   the guy get out of the car walking towards Portland Street,

12   where are you in your vehicle?

13   A.   I'm still in the passenger's seat, but I believe the

14   vehicle with both of us traveled on Osgood Street and then took

15   the right onto Portland Street.

16   Q.   Well, so as you drove up Osgood Street, did you pass the

17   passenger who was walking up the street?

18   A.   I can't recall whether we waited a little while to let him

19   go on foot because we would be -- there was nothing on Osgood

11:26 20   Street where he got out.  There was -- you know, he was walking

21   up the street.  We might not have followed him right away, but

22   ultimately we did come up Osgood and make the turn onto

23   Portland.

24   Q.   Okay.  And so when you're making observations of the

25   person walking up the street, are you seeing him from behind?

1   A.   Yes.

2   Q.   So at no time did you observe this person walking up the

3   street carrying a handful of money?

4   A.   I did not notice any money in his hand.

5   Q.   Did you actually see him get into the Kia on Portland

6   Street?

7   A.   I can't recall whether I saw it or whether I learned it

8   later.

9   Q.   So going back just for a minute to the Buick sedan, did

11:27 10   you or any of your fellow officers run the plate on that

11   dark-colored Buick?

12   A.   I did not.

13   Q.   Okay.  Did anybody else, to your knowledge?

14   A.   I don't recall any -- I don't recall if anyone else did.

15   Q.   Okay.  And, to your knowledge, to this day, that -- no one

16   has done any further investigation relative to that

17   dark-colored Buick sedan?

18   A.   I don't believe so, but I'm not the case agent.  I'm not

19   familiar with what's happened since then.

11:27 20   Q.   Let me ask you two quick, specific questions:  Is that

21   dark-colored Buick sedan a government vehicle?

22   A.   It is not.

23   Q.   Was the passenger who was walking up the street a

24   Government informant?

25   A.   Not that I know of.  Not somebody that was out with us

1    that day, no.

2    Q.    Okay.  So the guy gets into the Kia.  You turn the corner

3    at Portland Street.  You drive past the Kia up the road?

4    A.    I believe so, yes.

5    Q.    And do you then take a U-turn at some point?

6    A.    I think we turned right, and the Kia -- like I said, I'm

7    not -- I can't remember whether we were behind the Kia the

8    whole time or if it made a right -- there was a couple of

9    rights that feed down, or if the Kia itself had turned around

10   and gone down Osgood Street.  As we sit here right now, I can't

11   recall.

12   Q.    But, in any event, at some point you turned around and

13   attempted to follow the Kia?

14   A.    Yeah.  I think we met the Kia again on Market.  I wish I

15   had that map.  But, yeah, I think it's on Market, based on my

16   recollection.

17             MR. KELLY:  Do we have the map?

18             THE WITNESS:  I think we lost sight of the Kia for a

19   bit, but I might have that wrong.

20             MR. KELLY:  Could I have Exhibit 1?

21   BY MR. KELLY:

22   Q.    I don't know if that helps you at all, Special Agent

23   Cacace.

24   A.    Yeah.  I don't remember following the Kia down Osgood

25   Street.  I recall these -- it's kind of tough to see.  It's

faded on these maps, but there's a couple streets, like Temple.

My recollection is going down Temple Street and then coming

back to Market.  And as I sit here, I can't recall whether the

Kia is in front of us at that point or we met it again at

Market Street.

Q.   Okay.  Now -- I'm sorry.  Had you finished?

A.   Yeah.  Like I said -- what I was going to say is I can't

remember if the Kia passed us on Portland heading in an

easterly direction, or if it turned around and we just met

again on Market, as I sit here today.

Q.   Now, at some point, somebody, whether you and your

partners or one of the other cars, ran the license plate on the

Kia?

A.   Yes.

Q.   And it came back to this company called Eshan?

A.   Yes.

Q.   And you wrote in your report that Detective Gonzalez was

aware that this company lent its cars to people involved in the

drug business?

A.   Yes.  The radio -- Detective Gonzalez ran that tag -- my

recollection is that he ran it over the Lawrence dispatch, and

when it came back -- it was either over the air or he called

the dispatch on his cell phone, I don't recall which.  But I

remember hearing a female operator's voice saying it's that

same company and that -- you know, that they've been observing.

1   Q.   From July 10th to the present, has the task force or the

2   FBI done any further investigation with respect to Eshan

3   company?

4   A.   I don't know the answer to that.

5   Q.   Do you know that, in fact, that that is a legitimate

6   rental car agency that rents cars to all kinds of people?

7   A.   Actually, I take that back.  I do know that.  You were

8   correct in that it is a rental company, yes.

9   Q.   It's a local rental car company?

11:30 10   A.   Yes.

11   Q.   Now, you said that it's -- you can't recall that you

12   followed the car precisely, but at some point you know that the

13   car stopped somewhere in the vicinity of Loring Street and

14   Salem Street?

15   A.   Yes, actually on Salem Street.  It turned -- we were

16   behind the car on Loring, and then it turned onto Salem heading

17   initially in the southeastern direction and then turning right

18   onto Salem Street and pulling over at Salem.

19   Q.   Okay.

11:31 20        THE COURT:  At that point, the Kia had two people in

21   it?

22        THE WITNESS:  Yes.

23        MR. KELLY:  Now, I want to offer one additional

24   photograph that we haven't yet put into evidence.  I believe

25   it's Exhibit F, if I'm not mistaken, Lisa.

```
 1              THE CLERK:  I believe it is, yes.

 2              (Defendant Exhibit F received in evidence.)

 3    BY MR. KELLY:

 4    Q.   And up on the screen, Special Agent, do you recognize

 5    what's depicted there?

 6    A.   I recognize the convenience store that sits at the corner

 7    of Loring and Salem.

 8    Q.   So that's what's known as Hernandez Market?

 9    A.   It appears that way.  It's a little vague in the picture,

11:32 10   but I think so.

11    Q.   And if I was looking at this document, it's actually noted

12    on the thing -- there's a little blue mark there, and it says

13    Hernandez Market; do you see that?

14    A.   Yes.

15    Q.   That's right at kind of the southern side of Salem Street?

16    A.   Yes.

17    Q.   And is it fair to say, sir, that that's directly across

18    the crosswalk on Salem Street from where the Kia pulled over

19    and stopped?

11:32 20   A.   Yes.  If I'm looking at this right, and I assume I am,

21    where that backwards stop sign is, that that is Salem Street,

22    and that the -- where the "No Parking" sign is is Loring

23    Street.  I think it's --

24    Q.   I think we have a better image.  I am going to show you

25    Government Exhibit Number 4, which shows a little bit of a
```

1    different perspective, and I believe this is Loring Street --

2    A.   Yes.

3    Q.   -- and this is Salem Street?

4    A.   Yes.

5    Q.   So you would have come down Loring, and the Kia would have

6    stopped somewhere kind of just about where this white car is,

7    and this is Hernandez Market down here (indicating)?

8    A.   I think the Kia stopped -- not the white car that's in the

9    crosswalk.  I think the Kia stopped -- if I could point,

11:33 10   there's a black vehicle and then a lighter-color vehicle just

11   past that.  My recollection is the Kia pulled over somewhere.

12   Q.   Somewhere there?

13   A.   Somewhere there.

14   Q.   Made the corner, went up a couple of car lengths, and

15   pulled over?

16   A.   Yes.

17   Q.   And what did you then do, you and your partner?

18   A.   I put out on the radio that we observed the Buick and that

19   the passenger of the Kia was out.

11:33 20   Q.   And fair to say that for whatever reason, law enforcement

21   lost both the passenger and the Buick?

22   A.   Yes.

23   Q.   They vanished?

24   A.   Yes.

25   Q.   And you -- at some point, then, you and your partner,

1    drove your undercover vehicle past the Kia, which was idling or

2    parked along the area that you just described for us?

3    A.    Yes.

4    Q.    And you rolled down your window, and you tried to observe

5    what, if anything, was going on within the passenger's

6    compartment of that car?

7    A.    I don't recall rolling down my window or if it was already

8    down, but it might have been.

9    Q.    Okay.  And you were dressed in plain clothes?

11:34 10    A.    I had a vest emblazoned with "FBI," but I had a shirt over

11    it because we were doing surveillance before.

12    Q.    Okay.  So after the Kia dropped off the passenger, it

13    didn't immediately drive away.  It stayed for a few moments?

14    A.    It did.  I think we passed it and pulled over, and we

15    might have U-turned.  We U-turned twice.  I just can't recall

16    that for sure, but ultimately we ended up behind the Kia again.

17    Q.    Maybe this will help with your memory, sir.  Isn't it a

18    fact that what you did was you drove past the Kia, you took a

19    right on Osgood, stopped for a second.  At that point the Kia

11:35 20    pulled away down Salem Street.  You did a U-turn and drove back

21    towards Hernandez Market initially, and then a second U-turn to

22    go in the direction of the Kia?

23    A.    That's actually how I remember -- yes, that's how I

24    felt --

25    Q.    And by the time you made these two moves, the Kia had

1   actually opened up some space, some distance between you and

2   the car that you were in, correct?

3   A.   Yeah.   There was a fair amount of traffic around at that

4   time.

5   Q.   And so you had to kind of accelerate a little bit in order

6   to kind of catch up and not risk losing the Kia?

7   A.   Correct.

8   Q.   All right.   And so at some point you caught up to the car,

9   and you were fairly close behind the back of the Kia; were you

11:36 10   not?  Were you able to actually, you say, see somebody look in

11   the rearview mirror?

12   A.   I believe -- yes, and that was on Parker and Blanchard

13   Streets.   I think there were a couple of cars in between us

14   traveling on Salem, westerly on Salem, and the Kia made a right

15   on what I believe is Parker Street.   Once we made the right on

16   Parker Street, I believe we were number one behind the Kia.

17        And when it went left onto, I believe, Blanchard

18   Street, if I'm remembering the streets right, we were

19   ultimately -- we were behind the Kia on what I'm calling

11:36 20   Blanchard Street before it made the final turn onto Salem and

21   the stop at the Nyhan Bridge.

22   Q.   So now I'm showing you what's been marked as Exhibit E.

23   Do you recognize what's depicted there, Special Agent?

24   A.   Yes.   That's Salem Street, and the Nyhan Bridge is --

25   Q.   Up ahead there?

    1  A.   Up ahead, yes.

    2  Q.   And so your vehicle and the Kia were actually traveling in

    3  this direction towards the bridge as depicted in this

    4  photograph?

    5  A.   No.  If I'm looking at this right, the Kia would be coming

    6  at the photographer and as well as us, if I have this -- if

    7  this is oriented properly.

    8  Q.   I'm not sure that's the case.

    9       MR. PANICH:  Objection.

11:37 10       THE COURT:  Well, that's the testimony.

   11  BY MR. KELLY:

   12  Q.   All right.  Isn't it a fact, sir, that the lights in the

   13  undercover vehicle were not activated by Officer Hernandez

   14  until he -- you and the Kia turned onto Salem Street?

   15       MR. PANICH:  Objection.  Who's Officer Hernandez?

   16       MR. KELLY:  Sorry.

   17  Q.   Gonzalez, I apologize.

   18  A.   Yeah, I believe Officer Gonzalez activated the lights, on

   19  Salem Street.

11:37 20  Q.   So, in other words, he didn't activate the lights while on

   21  Blanchard Street?

   22  A.   No, he did not activate them on Blanchard Street, to my

   23  recollection.

   24  Q.   So he flips on the lights after he's already turned onto

   25  Salem Street, which is -- there's a bridge ahead of you,

1    correct?

2    A.   Yeah.

3    Q.   And how many seconds would you estimate it took the Kia to

4    stop after the lights were activated?

5    A.   10 to 20 seconds.  I don't think it was much longer than

6    that.

7    Q.   It could have been 10 seconds?

8    A.   Yeah.  There was traffic, but it didn't appear that the

9    Kia was stopping.  We were on the bridge, so it was a little

11:38 10   bit there before it stopped.  But it wasn't forever, no.

11   Q.   This particular bridge only is wide enough for a single

12   car to travel in each direction?

13   A.   Yes.

14   Q.   The driver of the Kia cleared the bridge, rather than pull

15   over on the bridge or just before the bridge; but as soon as he

16   cleared the bridge, he immediately pulled to the right and

17   stopped?

18   A.   Yes.

19   Q.   Okay.  And all the time that you were following him, he

11:38 20   broke no traffic laws, to your knowledge?

21   A.   I'm not a traffic officer, but I don't believe he did.

22   Q.   He wasn't speeding?

23   A.   No.

24   Q.   Didn't have a broken taillight?

25   A.   No.

```
 1    Q.   Okay.  So you then pulled in front of his car.  How did

 2    you position your car as to his once his car had stopped?

 3    A.   Detective Gonzalez said, "I'm going to pull around in

 4    front of him."  And he -- he pulled so that the nose of the

 5    unmarked was facing the bridge, the brick wall next to the

 6    bridge, but in a way that the driver of the Kia couldn't easily

 7    maneuver around us.

 8    Q.   So it was kind of on an angle?

 9    A.   It was on an angle, yes.  Thank you.

11:39 10    Q.   He didn't clear him and pull to the right, you know, some

11    like parallel parking?

12    A.   No.  He pulled at an angle.

13    Q.   And then the two of you exited the vehicle and walked back

14    towards the Kia?

15    A.   Yes.

16    Q.   You on the passenger's side; he on the driver's side?

17    A.   Yes.

18    Q.   And am I correct, sir, that when you got to the Kia, the

19    doors of the vehicle were locked?

11:40 20    A.   I can't recall whether they were locked, but they were

21    closed, yes.

22    Q.   The windows of the car were closed?

23    A.   I believe so.

24    Q.   Okay.  Did -- you said that Detective Gonzalez was doing

25    most of the communicating?
```

1    A.    Yes.

2    Q.    Did he yell or speak in a loud voice, "Turn off your

3    engine"?

4    A.    He might have.  The engine was still running.  I believe

5    he might have said to me that the car was in park -- I mean, in

6    drive.

7    Q.    Now, your report -- and I'm looking at Page 2.  You can go

8    to Page 2 of your report, that paragraph at the bottom.  It

9    says, "Kia's engine was on, and the transmission remained in

11:40 10   drive."  My question to you, sir, is:  That's not something

11   that you observed.  That's something that Detective Gonzalez

12   observed?

13   A.    That's my recollection.

14   Q.    And how would it have been possible for him approaching

15   the car from the front to know that the transmission was still

16   in drive?

17   A.    I think it was when he got to it, when he got to the

18   vehicle.

19   Q.    Oh.  That's what your recollection is?

11:41 20   A.    Yes.

21   Q.    Okay.  So once he got to the vehicle, did -- what's the

22   first thing that happened?

23   A.    He approached the driver and told him that we were

24   investigating narcotics activity.

25   Q.    Did he do that through the window?

1    A.   I don't recall whether the window was down or not.

2    Q.   Do you recall, sir, that the driver of the vehicle put his

3    hands like this (demonstrating) and said, "What's this all

4    about?"

5    A.   I don't recall, but -- I don't recall him making any moves

6    with his hands while we were approaching the vehicle.  It is

7    quite possible that he put his hands up and asked what was

8    going on.

9    Q.   And is it your recollection, sir, that after he did that

11:42 10   is when he reached for this iPhone and said to the

11   officer -- to Detective Gonzalez, who was on his side, "I want

12   to turn on my phone and record this for either my safety or

13   both of our safeties"?

14   A.   He ultimately did but not immediately.

15   Q.   Okay.  When's your recollection as to when he turned on

16   the iPhone?

17   A.   Into a short duration to the stop because there wasn't a

18   ton of time or discussion, but I recall it being after

19   Detective Gonzalez Mirandized him and told him that we had

11:42 20   observed him with somebody in that car.

21   Q.   Now, you've been doing drug cases, I think, for 11 years

22   or so?

23   A.   Yep.

24   Q.   Has it been your practice or experience that an officer

25   approaching a vehicle like this would just immediately, first

1    thing, read somebody his Miranda rights?

2              MR. PANICH:  Objection.

3              THE COURT:  What's the objection?

4              MR. PANICH:  Relevance of what his experience is as to

5    whether what actually happened.

6              THE COURT:  I mean, the Miranda rights and the

7    immediacy --

8              MR. PANICH:  I agree.

9              THE COURT:  -- of the Miranda rights came out in the

11:43 10   government's first witness.

11             MR. PANICH:  I agree.  The question was:  Was this

12   consistent with previous experiences you had and not about what

13   actually happened.

14             THE COURT:  He's asking whether it's usual to do it

15   that way, I think.

16             MR. PANICH:  Agreed.  I would challenge the relevance.

17   That's all.

18             THE COURT:  Okay.  Your objection is noted.

19   BY MR. KELLY:

11:43 20   Q.   Do you understand the question?

21   A.   Could you repeat the question, please?

22   Q.   Based on your, you know, practice and past experience, is

23   it your -- has it been your experience that the first thing an

24   officer would do in approaching a car which had just been

25   stopped is read somebody his Miranda rights?

1    A.    Not that often, no.

2    Q.    And, in fact, is it your recollection, sir, that at the

3    time these rights were allegedly read, that the doors were

4    closed?

5    A.    The passenger's door was open because I opened it.

6    Q.    Okay.  At some point did you learn that the passenger's

7    door was locked?  Did you try to open it and determine that it

8    was locked?

9    A.    It's possible.  I don't recall now.  I might have told

11:44 10   Mr. Jimenez --

11   Q.    But at some point you opened the door?

12   A.    Yes.

13   Q.    Do you recall if the door was opened at the time that

14   Detective Gonzalez provided these Miranda rights, allegedly?

15   A.    Yes.

16   Q.    And how did he provide the Miranda rights?

17   A.    He -- initially, he told Mr. Jimenez that we were

18   investigating narcotics activity and that he -- we asked -- he

19   asked who was in the vehicle.  Mr. Jimenez denied anyone was in

11:44 20   the vehicle, and then my recollection is Detective Gonzalez

21   read him the Miranda rights.

22   Q.    Read him?

23   A.    Advised him of the Miranda rights.

24   Q.    Was he reading from something?

25   A.    I didn't pay attention to whether he was reading it or

1    whether he was looking at them.

2    Q.   So your recollection is that the sequence of events is

3    that he walks up, tells him he's doing a drug investigation,

4    effectively, and asked him a question?

5    A.   Yes.

6    Q.   Prior to allegedly reading these Miranda rights?

7    A.   Yes.

8    Q.   Does he do that through the closed window and the closed

9    driver's door?

11:45 10   A.   I believe that either the window was down or -- and the

11   door was shut; that's my recollection.  I don't remember him

12   opening the driver's door.  But -- or Mr. Jimenez opening the

13   driver's door.  I just don't recall.

14   Q.   How sure are you as to whether the window was closed or

15   opened?

16   A.   I'm not positive.

17   Q.   Now, you said that the cell phone -- the iPhone was placed

18   in the console area and recording this transaction during the

19   entire period of the stop, at least until the phones were

11:46 20   removed from the car?

21   A.   No.  I thought that Mr. Jimenez asked to record it

22   subsequent to Detective Gonzalez advising him of his Miranda

23   rights, as well as -- and then Mr. Jimenez said -- then

24   acknowledged that he did have somebody in the car and then that

25   he wanted to record the transaction.

1    Q.    How sure are you, Agent, of the sequencing of these

2    events?

3    A.    I'm not positive --

4    Q.    Okay.

5    A.    -- but that's my recollection.

6    Q.    Now, at some point you found a second cell phone.  Am I

7    correct, sir, that both of those two cell phones were removed

8    from the passenger's compartment and were placed in the trunk

9    area of the Kia?

11:46 10   A.    I don't remember the iPhone being removed from the Kia

11   while we were at the back of the vehicle.  I remember the other

12   phone, which I did not remove, but it -- ultimately, through

13   conversation or what have you, Detective Gonzalez, while

14   Mr. Jimenez was placing the iPhone that he was moving with his

15   left hand, and -- somewhere between the seat or the crotch, and

16   that was what made Mister -- made Detective Gonzalez take him

17   out of the vehicle.  It was the movement that I didn't see.

18   Q.    At any point, sir, Special Agent, did you shut off the

19   iPhone?

11:47 20   A.    I did not, no.

21   Q.    Do you know -- did you observe Detective Gonzalez shut off

22   the iPhone?

23   A.    I did not.

24   Q.    Just one quick question before I move to what you just

25   told us.  The Kia that you observed that particular day was

1    black in color; was it not?

2    A.    I believe so -- no, I know it was.  Yes.

3    Q.    But it was a Kia Forte, identical to this model which is

4    shown here on Exhibit D?

5    A.    Yes.

6    Q.    And as you were driving up from the back, roughly this is

7    what the back of the Kia looks like?

8    A.    Yes.

9    Q.    Now, you said that at that point Detective Gonzalez asked

11:48 10   the driver to step out of the car?

11   A.    Yes.

12   Q.    Did he do it in a polite voice or did he direct him to get

13   out of the car?

14   A.    I think he told him that, "I'm going to take you out of

15   the car" or --

16   Q.    Okay.  And he pulled him out of the car.  And at the time

17   he did that, he held onto his waistband; did he not?

18   A.    Yes.

19   Q.    And -- because he didn't want the guy to run away?

11:48 20   A.    No, he did not.

21   Q.    But the passenger -- excuse me.  The driver complied with

22   his request and voluntarily exited the car?

23   A.    Yes.

24   Q.    He wasn't belligerent; didn't offer any resistance?

25   A.    No, he did not.

```
 1   Q.   Up to that point you hadn't made any observations of any
 2   weapons in the car?
 3   A.   I had not, no.
 4   Q.   You didn't know this driver.  You hadn't encountered him
 5   previously?
 6   A.   No.
 7   Q.   He hadn't committed any traffic violations of any kind?
 8   A.   Again, I don't know every traffic law, but I don't believe
 9   that he had -- I don't believe that we pulled him over for a
10   traffic violation.
11   Q.   And you were asked a number of questions, including by
12   Judge Zobel, about the pat frisk that went on.
13   A.   Yes.
14   Q.   So am I correct, sir, that the two of you are both kind of
15   pat frisking him, one on one side, one on the other, whether at
16   the same time or in sequence, around that time?
17   A.   Yes.
18   Q.   And then you found the currency?
19   A.   Correct.
20   Q.   And Detective Gonzalez found the ChapStick?
21   A.   Correct.
22   Q.   And at some point in time did you say to Detective
23   Gonzalez, based on what you had frisked, he was clean?
24   A.   On my side, yes.
25   Q.   Okay.  Did Detective Gonzalez then direct you to pat frisk
```

1   him again?

2   A.   Yes.

3   Q.   And did you do so?

4   A.   I did.

5   Q.   And after you completed that, what did you say to

6   Detective Gonzalez?

7   A.   I said I didn't find anything or he was clean or --

8   Q.   Okay.  So you found no hard objects that you understood to

9   be either a gun or a knife?

11:50  10   A.   Correct.

11   Q.   Or a weapon of any kind?

12   A.   Correct.

13   Q.   And Detective Gonzalez told you that he had encountered

14   something in the crotch area of the driver?

15   A.   Yes.

16   Q.   And did he describe it?

17   A.   I think he said he had something in there, or there's

18   something down there.

19   Q.   Okay.  Did he say if it was a hard object?

11:50  20   A.   I think he said it was something hard, but I don't

21   remember his exact words.  It was either, "There's something

22   hard in there," or, "There's something down there."

23   Q.   Okay.

24   A.   Which I did not pat Mr. Jimenez's crotch area.

25   Q.   Okay.  Do you recall, by the way, what kind of pants

1    Mr. Jimenez was wearing on that particular day?

2    A.    I don't.

3    Q.    Do you know whether or not -- does it refresh your

4    recollection that he was wearing what we call cargo pants,

5    which are kind of loose fitting, kind of green in color, pants?

6    A.    I don't have a recollection.  I remember the dark pants.

7    Q.    Okay.

8    A.    If that's what you're telling me he's wearing, I don't

9    have anything to say that they weren't.

11:51 10    Q.    Fair to say, Special Agent, you didn't make any

11    observations of any unusual bulges in his pants, for example?

12    A.    With the exception of the cash, no.

13    Q.    With the cash in the pocket?

14    A.    Yes.

15    Q.    But no other bulges that you observed?

16    A.    Not that I observed.

17    Q.    And when Detective Gonzalez felt something that he thought

18    was odd or weird or out of place, what happened next?

19    A.    When he told -- before he told me to pat him again or

11:52 20    subsequent to that?

21    Q.    Subsequent to that.

22    A.    I can't remember.  But ultimately, I believe, it was

23    Detective Gonzalez who found the drugs in his crotch.

24    Q.    Did Detective Gonzalez ask the driver if he could reach

25    into his crotch area or his underwear?

1   A.   I don't recall.

2   Q.   Do you recall the driver resisting and saying, "Wait."

3   You know, "I don't want you searching my crotch"?

4   A.   I don't recall.

5   Q.   Okay.  But, in any event, somebody donned the glove, a

6   rubber glove of some kind, right?

7   A.   Yes.

8   Q.   And undid the front of the driver's pants and reached into

9   his underwear?

11:52 10   A.   Yes.

11   Q.   Okay.  And your recollection is that that was Detective

12   Reardon, not Detective Gonzalez?

13   A.   Right.

14   Q.   Okay.

15   A.   Detective Reardon retrieved it.  I don't know if Detective

16   Gonzalez did it initially, but he didn't -- I don't recall

17   Detective Gonzalez having gloves on either, and I know I didn't

18   have gloves on.

19   Q.   So would I be correct, Special Agent, that effectively

11:53 20   there was an initial pat down by you?  There was a second pat

21   down by you, correct?

22   A.   Right.

23   Q.   There was also kind of a simultaneous pat down by

24   Detective Gonzalez on the other side?

25   A.   Yes.

1    Q.   And then there was basically a full-blown search of this

2    guy's underwear?

3              MR. PANICH:  Objection.

4    BY MR. KELLY:

5    Q.   I mean, it had ceased to be a pat down of the exterior

6    clothing.  They reached in?

7              MR. PANICH:  Same objection.

8              THE COURT:  What's the objection?

9              MR. PANICH:  Sorry.  I withdraw the objection.

11:53 10   BY MR. KELLY:

11   Q.   At some point after these pat frisks, somebody donned a

12   glove and reached right into his underwear, correct?

13   A.   Ultimately, they did, yes.

14   Q.   Yes.  Okay.  And it was only at that point, after they

15   pulled out some bag or whatever, that he was placed under

16   arrest?

17   A.   Yes.

18   Q.   So he had not been placed under arrest until after the

19   discovery of the item in the underwear?

11:53 20   A.   Of the drugs, no.

21   Q.   Okay.  He was certainly not free to leave, however, from

22   the moment of the traffic stop.  And, in fact, he was

23   physically restrained by Detective Gonzalez?

24   A.   Yes.

25   Q.   So he was in custody but not formally arrested?

 1          MR. PANICH:  Objection.

 2          THE COURT:  I don't know really what the difference

 3   is.

 4   BY MR. KELLY:

 5   Q.   Well, he was not free to leave, but he hadn't been

 6   formally placed under arrest?

 7   A.   Correct.

 8   Q.   And then what happened after he was placed under arrest?

 9   A.   He was placed under arrest; he was handcuffed; and we

11:54 10   waited for a transport vehicle.

11   Q.   Okay.  And how long did you have to wait for the transport

12   vehicle?

13          MR. PANICH:  Objection, scope.

14          THE COURT:  What's the objection?

15          MR. PANICH:  Scope.  This goes after the point of

16   harassment.  I'm not sure what this has to do with --

17          THE COURT:  I don't know what the purpose of it is,

18   but I'll allow that question.

19   BY MR. KELLY:

11:54 20   Q.   How long did you wait for the transport vehicle to arrive?

21   A.   I'm not sure.  It could have been a few minutes.  There

22   were other officers there.  Like, Detective Reardon was not

23   riding with us.  I think there was a delay that we were trying

24   to decide -- we were asking the command post in this operation

25   whether the U.S. Attorney's office was going to charge

```
 1    Mr. Jimenez or whether he was going to be charged in Lawrence
 2    District Court.
 3    Q.   But during the time that you were waiting for the
 4    transport vehicle to arrive, you engaged in conversations with
 5    the driver?
 6              MR. PANICH:  Objection.  Relevance, scope.
 7              THE COURT:  I don't know where you are going.
 8              MR. KELLY:  I can connect this, Your Honor, because it
 9    relates to the next witness, so it's important.
10              THE COURT:  I thought this was the only witness we
11    had.
12              MR. KELLY:  We have a very short five-minute witness.
13              MR. PANICH:  His witness, Your Honor, not mine.
14              THE COURT:  Well, I'll allow it de bene.
15    BY MR. KELLY:
16    Q.   Did you engage in conversation with the driver?
17    A.   I did.
18    Q.   And you were effectively asking the driver to cooperate
19    with you?
20    A.   Yes.
21    Q.   And he didn't have anything to offer?
22    A.   He told me he did not.
23    Q.   Okay.  And when the transport vehicle arrived, it was
24    actually Special Agent Weidlich who was part of that transport
25    team?
```

11:55 (line 10)
11:55 (line 20)

A.   I believe so.  I'm not sure if he arrived in that vehicle

or if he was there and then left in that vehicle.  I know

ultimately he did.  Whether he arrived in the van or he was

there previous in the vehicle, I don't remember what vehicle he

was riding in that day.

Q.   After the driver was placed formally under arrest,

after you told him he was under arrest, was he handcuffed?

A.   He was --

Q.   At that point handcuffed?

A.   I believe so.

     MR. PANICH:  Just for the record, I understand that

you are letting this in de bene?

     THE COURT:  I'm not sure where you're going,

Mr. Kelly.

     MR. KELLY:  I'm almost done, Your Honor.

     THE COURT:  It's all de bene.

BY MR. KELLY:

Q.   He was handcuffed.  At that point, sir, did either you or

Detective Gonzalez read him his rights?

A.   No.

Q.   And do you know when he was next read his rights?

A.   Based on what I learned from Detective -- Special Agent --

     THE COURT:  That certainly is hearsay.

     MR. KELLY:  I'm sorry?

     MR. PANICH:  It's hearsay.

1          THE COURT:  You don't know of your own -- based on

2     your observation?

3          THE WITNESS:  I didn't Mirandize him myself, no.

4          THE COURT:  Did you see anybody doing it other than

5     Mr. Gonzalez early on?

6          THE WITNESS:  I don't recall seeing anyone Mirandizing

7     him.

8     BY MR. KELLY:

9     Q.   So at no point during your interaction did you provide

11:57 10    Miranda warnings to the driver?

11    A.   I did not.

12         MR. KELLY:  No further questions, Your Honor.

13         THE COURT:  Any redirect?

14         MR. PANICH:  Very briefly.

15                          REDIRECT EXAMINATION

16    BY MR. PANICH:

17    Q.   Special Agent Cacace, you testified earlier that it was

18    not necessarily typical in your FBI experience to read Miranda

19    rights at the outset of interaction with the suspect; is that

11:57 20    fair?

21    A.   That's fair.

22    Q.   What experience --

23    A.   If the subject wasn't originally under arrest, yes.

24    Q.   What experience do you have with Lawrence Police

25    procedures?

A.   Not that often.  I don't know that I've ever been in a probable cause arrest with Lawrence PD prior to this initiative.

Q.   Who activated the lights and sirens?  Was it you or Detective Gonzalez?

A.   Detective Gonzalez.

Q.   And during the -- during the course of the questions that Detective Gonzalez asked to Mr. Jimenez, where were you looking?  At Detective Gonzalez?  At Mr. Jimenez?

11:58 A.   Mr. Jimenez and the right side of -- my area of responsibility was on Mr. Jimenez's right side as he sat in the Kia automobile.

Q.   And why was your focus on that side?

A.   Because that's where I was standing.  And if he had moved for something on the right side, it was my responsibility to either take action or alert Detective Gonzalez or intervene of some sort.  My responsibilities were what I could see.  I couldn't see across his left side of his body.

MR. PANICH:  Nothing further, Your Honor.

11:59 THE COURT:  Any recross?

MR. KELLY:  No, Your Honor.

THE COURT:  Thank you, Mr. Cacace.  You're excused. Who's next?

MR. PANICH:  No further witnesses from the Government.

MR. KELLY:  We call Special Agent Weidlich, very

1   briefly, Your Honor.

2          THE COURT:  How do you spell his name?

3          MR. KELLY:  W-e-i-d-l-i-c-h, Weidlich.

4          THE CLERK:  May I ask you to raise --

5          (Witness sworn.)

6          THE WITNESS:  I do.

7          THE CLERK:  Okay.  Sir, may I ask you, please, to

8   state your name, spelling your last name for the record,

9   please, sir.

12:00 10          THE WITNESS:  Keith Weidlich, W-e-i-d-l-i-c-h.

11          THE COURT:  W-e-i-d-l-i-c-h?

12          THE WITNESS:  Correct.

13          THE COURT:  Thank you.

14          KEITH WEIDLICH, having been duly sworn by the Clerk,

15   was examined and testified as follows:

16                      DIRECT EXAMINATION

17   BY MR. KELLY:

18   Q.   Good morning, Special Agent Weidlich, can you tell us how

19   you're employed, sir?

12:00 20   A.   I'm employed by the FBI.

21   Q.   Okay.  How long have you been with the FBI?

22   A.   About 11 years.

23   Q.   And what's your current position?

24   A.   I work in Lowell on a drug task force.

25   Q.   And how were you employed as of July 10th of 2019?

1    A.    The same, on that task force in Lowell.

2    Q.    Okay.  And do you occupy -- or on that date did you occupy

3    a supervisory role?

4    A.    I did not.

5    Q.    You did not?

6    A.    No.

7    Q.    Were you just a task force agent?

8    A.    Correct.

9    Q.    And were you working on July 10th, 2019?

12:01 10    A.    Yes, I was.

11    Q.    And what area were you working in?

12    A.    We were working in Lawrence.

13    Q.    And can you tell us approximately how many other law

14    enforcement officers were working with you that day?

15    A.    Just on my task force or just Lawrence?

16    Q.    Well, do your task force first.

17    A.    I would approximate there were nine to ten.

18    Q.    Okay.

19              THE COURT:  I'm sorry?

12:01 20              THE WITNESS:  Nine or ten.

21    BY MR. KELLY:

22    Q.    Okay.  And were you partnered with a specific officer or

23    agent?

24    A.    I was.

25    Q.    And who was that?

1    A.    That was Robert Heffernan.

2    Q.    Heffernan?

3    A.    Yes.

4    Q.    What time did you start your day that day?

5    A.    I would say approximately 9:00 a.m.

6    Q.    Okay.  And this event that we're talking about here in

7    this case, and I'm going to ask you a couple of questions about

8    momentarily, took place at or shortly after 5:00 p.m., correct?

9    A.    That's correct.

12:02 10    Q.    And fair to say that between the hours of 9:00 a.m. and

11    5:00 p.m. that you were basically patrolling around the area

12    looking for other suspicious activity?

13    A.    Correct.

14    Q.    And are you the case agent on this particular case

15    involving Mr. Jimenez?

16    A.    I am.

17    Q.    And so that means you're responsible for having sworn out

18    the affidavit for the criminal complaint for the search

19    warrant, things of that nature?

12:02 20    A.    Correct.

21    Q.    And to have filed your own FBI-302 report?

22    A.    Correct.

23    Q.    Now, you were not involved in the actual stopping of the

24    vehicle, this black Kia automobile, on this particular day,

25    correct, sir?

1    A.    No, I wasn't.

2    Q.    Okay.  And prior to the stopping of that vehicle in the

3    vicinity of this Nyhan Bridge, had you been involved in making

4    any observations of either the black Kia or another

5    dark-colored Buick?

6    A.    No, I wasn't.

7    Q.    Okay.  So when were you first called and asked to assist

8    in this matter?

9    A.    I was there the whole time this incident was taking place.

12:03  10    I'm only aware of what took place through radio transmissions

11    or through the limited radio transmissions we had that day.

12    Q.    Okay.  So you weren't following cars or surveilling people

13    walking or anything like that?

14    A.    Neither the Kia or the brown sedan, no.

15    Q.    Okay.  But you were out on the streets; you were in the

16    neighborhood?

17    A.    Correct.

18    Q.    Were you in a car?

19    A.    I was.

12:03  20    Q.    And you know, first of all, that one of the two cars that

21    they were focused on at this time after 5:00 p.m., this Buick,

22    dark-colored Buick, they lost it.  It got away and nobody saw

23    where it went?

24    A.    Yes, I'm aware.

25    Q.    And the same thing is true of the passenger from that car

1  that was walking; at some point surveillance officers lost the

2  person?

3  A.   Correct.

4  Q.   Okay.  So when -- who calls you to the scene of where the

5  vehicle is stopped?

6  A.   So I don't recall if I heard a radio transmission that

7  something had happened or someone had called me on the phone to

8  tell me of the car stop.  I did not initially know of the car

9  stop due to the radio issues.

12:04 10  Q.   Okay.  So you effectively play the role of -- you

11  transport the driver of the Kia from the location from which he

12  was placed under arrest by the bridge back to the police

13  station in North Andover, correct?

14  A.   Yes, sir.

15  Q.   So why did they take him to North Andover if this took

16  place in Lawrence, by the why?

17  A.   North Andover is a federal holding facility.  So due to

18  the time and stuff, we can process him there.  If he's held

19  over by the court for the morning, he can stay there.

12:05 20  Q.   So what kind of a car -- so you took custody of the driver

21  from the officer that had made the stop and arrest, and you

22  were responsible from that point until they got him to the

23  station?

24  A.   Yes, that's correct.

25  Q.   And what kind of a vehicle were you transporting him in?

1    A.   I believe it was a minivan, sir.

2    Q.   A minivan?

3    A.   Yes.

4    Q.   And were there any other persons, other than you and your

5    partner, in that minivan on this occasion?

6         MR. PANICH:  Objection.  I've let this go a little

7    bit.  But, again, I think this goes to relevance.

8         THE COURT:  I don't know yet.

9    BY MR. KELLY:

12:05 10   Q.   Was there anybody else in the van besides you and your

11   partner and the driver once you placed him in the van?

12   A.   No.

13   Q.   Okay.  And what did you do -- did you have any

14   communication or interaction with the driver once he was seated

15   inside the van?

16   A.   Yes, I did.

17   Q.   Tell us about that.

18        MR. PANICH:  Again, relevance.

19        THE COURT:  What is the relevance?

12:05 20        MR. KELLY:  I'm going to come to that in just a

21   second.

22        MR. PANICH:  And it's also --

23        MR. KELLY:  I'll try to speed --

24        MR. PANICH:  It's also hearsay because he's asking

25   about the defendant's statements.

```
 1              MR. KELLY:  It's a suppression hearing, Your Honor.

 2              THE COURT:  I'm sorry?

 3              MR. KELLY:  I can move it along fairly quickly, Your

 4    Honor, with just a few pointed questions.

 5              THE COURT:  Okay.

 6    BY MR. KELLY:

 7    Q.   Once the driver got into the van, you asked the driver

 8    whether he had been given his Miranda rights, correct?

 9    A.   It would have been, yes, "Were you ever?" or "Have you

 10   ever?"

 11   Q.   And the driver told you, no, that he had not been given

 12   his Miranda rights; fair to say?

 13             MR. PANICH:  Objection.

 14             THE COURT:  Wait a minute.  Which driver is this?

 15             MR. KELLY:  I'm sorry, Your Honor.  I will be more

 16   clearer.

 17   BY MR. KELLY:

 18   Q.   Do you recognize the person who you transported that day

 19   in the courtroom here today?

 20   A.   Yes, sir.

 21   Q.   And how is he dressed?

 22   A.   He has a green-and-black plaid jacket on.

 23   Q.   That's the person you transported that we've been talking

 24   about, correct?

 25   A.   Yes, sir.
```

1   Q.   After you placed Mr. Jimenez, the driver, into the van,

2   you asked him whether he had been provided with his Miranda

3   rights; did you not?

4   A.   Not in that way.

5   Q.   Okay.  But you asked him the question, perhaps not in

6   those words?

7   A.   Yes.

8          THE COURT:  What did you ask him?

9          THE WITNESS:  Your Honor, it would have been, "Have

12:07 10   you ever?" or "Were you ever read your Miranda rights?"  It's a

11   holdover from my training when I was a cop earlier.

12   BY MR. KELLY:

13   Q.   And how did he respond?

14          MR. PANICH:  Objection, hearsay.

15          THE COURT:  No, I'll allow it.

16   BY MR. KELLY:

17   Q.   How did he respond?

18   A.   I don't recall him responding at all.

19   Q.   Okay.  You don't recall him saying "No"?

12:07 20   A.   No.  This is a process --

21          THE COURT:  No, I don't think we go that --

22   BY MR. KELLY:

23   Q.   All right.  So you don't recall him responding at all.

24   What did you next do?

25   A.   I re-Mirandaed.

1    Q.    And did you have him sign anything?

2    A.    No.  I had the Miranda card with me.

3    Q.    To your knowledge, was the defendant ever asked to sign a

4    form by you acknowledging his Miranda rights?

5    A.    Not by me.

6    Q.    Why did you feel the need to provide Mr. Jimenez with his

7    Miranda rights at that time?

8              MR. PANICH:  Objection.

9              THE COURT:  I don't think we need to get into that.

12:08 10   BY MR. KELLY:

11    Q.    Well, had you been told by the officers at the scene that

12    you were taking custody of the driver from whether they had

13    already provided him with his Miranda rights?

14             MR. PANICH:  Objection.  Calls for hearsay.

15             MR. KELLY:  It's a suppression hearing, Your Honor.

16    The rules --

17             THE COURT:  I'll allow it.

18   BY MR. KELLY:

19    Q.    Had you asked the officers at the scene whether they had

12:08 20   provided Miranda rights to the defendant?

21             MR. PANICH:  It's also a leading question, Your Honor.

22             MR. KELLY:  I am trying to move it along, Your Honor.

23             THE COURT:  I'm sorry?

24             MR. KELLY:  Let me ask the question again.

25   BY MR. KELLY:

1    Q.    Had you asked the officers at the scene from whom you took

2    custody of Mr. Jimenez whether they had provided him with his

3    Miranda warnings?

4         THE COURT:  He can answer that "Yes" or "No" or "I

5    don't know."

6    A.    No, I did not.

7    BY MR. KELLY:

8    Q.    You did not ask them?

9    A.    Correct.

12:09 10   Q.    And so you -- as of the time you step into the van, you

11   did not know whether he had been Mirandized?

12   A.    That's correct.

13   Q.    And that was the reason why you felt the need to provide

14   him with his Miranda warnings?

15        MR. PANICH:  Objection.

16        THE COURT:  The objection is sustained.

17   BY MR. KELLY:

18   Q.    When you -- when you completed -- you recall that you

19   swore out under oath an affidavit in support of the criminal

12:09 20   complaint the very next day, July 11th, 2019, correct?  Do you

21   recall that?

22   A.    That's correct.

23   Q.    And you described certain things that took place out on

24   the street in connection with this stop, in your affidavit?

25        MR. PANICH:  Objection.  This is all calling for

1    hearsay.  I'm sorry to be a --

2         MR. KELLY:  I'm asking him about his own sworn

3    testimony and in an affidavit which he supplied to the court.

4         MR. PANICH:  Which was, I think, almost entirely based

5    on hearsay.

6         THE COURT:  This is an affidavit that's filed in

7    conjunction with this motion?

8         MR. KELLY:  It's filed in conjunction with the

9    criminal complaint that was first filed prior to the indictment

12:10 10   in this case, Your Honor.

11        THE COURT:  How does that come into evidence in this

12   proceeding now?

13        MR. KELLY:  Well, again, Your Honor --

14        THE COURT:  I mean, you can certainly ask him about

15   any substance that has to do with the incident of the stopping

16   of the car and the arrest and so on.

17        MR. PANICH:  And I would respectfully suggest, Your

18   Honor, that he's already testified he wasn't present.

19        THE COURT:  Well, I mean, if he has any more questions

12:11 20   about that, he can do that.

21        But try to do it without invoking earlier testimony

22   that may not be admissible by itself.

23   BY MR. KELLY:

24   Q.   And in connection with the preparation of your sworn

25   affidavit, who did you obtain information from?

1    A.   Several of the officers that were there.

2    Q.   Okay.  And did you speak with Special Agent Cacace, your

3    colleague?

4    A.   I am sure I did, yes.

5    Q.   And at any time did Special Agent Cacace tell you that he

6    had provided this defendant, Mr. Jimenez, with his Miranda

7    rights?

8         MR. PANICH:  Objection.  It's calling for more

9    hearsay.

12:11 10      THE COURT:  Well, we have Mr. Cacace's testimony.  We

11   have Mr. Gonzalez's testimony.  They were both cross-examined.

12   So I think what happened long after that in any conversation

13   between Mr. Cacace or Mr. Gonzalez and Mr. Weidlich is sort of

14   not relevant.  I mean, it's not admissible.  You may sit down.

15   BY MR. KELLY:

16   Q.   The information that you -- contained within the affidavit

17   that you filed with the court was not information -- and I'm

18   talking about the information relative to the stop and what

19   took place at the street there, was information that you had no

12:12 20   personal knowledge of?

21   A.   I did have personal knowledge of, based on the radio

22   transmissions.  I did not observe a lot of these things, if

23   that's what you're referring to.

24   Q.   But in terms of what took place after they stopped the car

25   and their interactions with the driver which were not part of

1  the radio transmissions, you had no direct personal knowledge

2  of what transpired at the roadside?

3  A.    Correct.

4         THE COURT:  Excuse me.  This affidavit is not part of

5  this proceeding today.  It's not evidence in this proceeding

6  today.

7         MR. KELLY:  I understand, Your Honor.  It's just that

8  there are inconsistencies between what he said and what's in

9  here.

12:13 10        THE COURT:  Well, if you want to point out

11  inconsistencies, you can certainly do that.  I mean, you can

12  use his prior statement to show inconsistency, but that's not

13  really what you're doing.

14        MR. KELLY:  Actually, you know what, Your Honor?  I'm

15  finished.  No further questions of this witness.

16        THE COURT:  Okay.  And you don't have any questions?

17        MR. PANICH:  I do not.

18        THE COURT:  Thank you, Mr. Weidlich.  You're excused.

19        THE WITNESS:  Thank you, Your Honor.

12:13 20        THE COURT:  Who is next?

21        MR. KELLY:  That's it from us.

22        THE COURT:  Now, do Counsel wish to argue?  Or should

23  I rely on your briefs?  Is the affidavit part of this

24  proceeding now?

25        MR. PANICH:  No, Your Honor.

1          THE COURT:  There's no affidavit?

2          MR. PANICH:  Correct.

3          MR. KELLY:  Well, there is an affidavit from

4    Mr. Jimenez, Your Honor, which is attached to our motion in

5    memorandum.

6          MR. PANICH:  Which, Your Honor, I think there's clear

7    case law it's not admissible, given the fact that they haven't

8    offered him as a witness.

9          THE COURT:  Whose affidavit is this, Mr. Kelly?

12:14 10          MR. KELLY:  Attached to our motion in memorandum is an

11    affidavit of the defendant as to what transpired.

12          MR. PANICH:  Your Honor, *United States versus* --

13          THE COURT:  How can I use the affidavit if he doesn't

14    testify?  Does he waive his Fifth Amendment rights by relying

15    on an affidavit that is his statement?

16          MR. KELLY:  I mean, it is his sworn statement, Your

17    Honor, under oath as to what transpired there at the --

18          THE COURT:  I understand that, but I assume he's not

19    testifying in order to preserve his Fifth Amendment rights.

12:14 20    And I'm not sure he can get around it by giving me a written

21    statement.  I mean, I'll look into it, and I'll -- we'll mark

22    it for identification or as part of the record already, but I

23    am not sure that I can use it without his actually testifying.

24          MR. PANICH:  And for Your Honor's help, I point you

25    to, I believe it's *United States v. Curry,* which is cited in

*United States versus Phillipos* in a more recent First Circuit

decision -- I think it's 2014 or thereabouts -- but I think

that's where addressing the issue that --

THE COURT:  Well, I'm on notice that the defense would

like to use it, and I'm not sure that I can without

compromising -- well, I guess I can't because he's not actually

testifying.

MR. KELLY:  Your Honor, I am happy if the Court will

permit us to be heard briefly.

THE COURT:  Okay.  So do Counsel want to file

additional written argument?  Or do you wish to have argument

now or at another time?  Or can I just take the papers based on

what I have heard?

MR. KELLY:  I think you can take the papers as they've

been submitted.

THE COURT:  The Government agrees?

MR. PANICH:  Your Honor, I don't think I have anything

to add except that I think there are numerous ways to find in

favor of the Government here both on the Fourth Amendment issue

and Fifth Amendment issue.

With respect to the Fifth Amendment issue, there's

uncontested testimony that Detective Gonzalez read Mr. Jimenez

his Miranda warning at the outset of their encounter.  And even

if he hadn't, which he had, I don't think, based on the factors

we cited to in our brief, he was in custody.  Again, I think

1    the Miranda warnings solves this entirely.  It's uncontested.

2           On the Fourth Amendment issue, the witnesses have

3    testified to all the things they observed prior to the car

4    stop.  I won't belabor --

5           THE COURT:  So you do want to argue to that extent?

6           MR. PANICH:  I don't want to open the door to more

7    open argument.  I do want to -- well, I'll point to the briefs.

8    I think it's laid out there.  I won't say anything further.

9           THE COURT:  Okay.  So I will take the papers.  And to

12:16 10   the extent that Mr. Kelly wants to rely on the affidavit of the

11   defendant, he may give me some law on that, but -- and you may

12   respond to his outline of the law.

13          MR. PANICH:  So just for the case cite, Your Honor,

14   *Phillipos* is 849, F.3rd 464.  And that discusses, I believe

15   it's *Curry* therein, which addresses the issue.

16          MR. KELLY:  Your Honor, if I could be heard briefly.

17   First of all, I'll remind the Court that we still have this

18   open issue of the cell phone, and there's somewhat conflicting

19   testimony here now in terms of, you know, at what point was

12:17 20   this cell phone turned on and how much of this encounter was

21   captured on audio and/or video.

22          I suggest for the Court that in this instance it would

23   be enormously helpful to the Court to have access to something

24   which actually documents what actually took place there on the

25   street.

1          And even if at some point they moved the phone, no one

2     has testified that they turned it off, and it is highly likely

3     that some of the audio continued to be picked up.

4          And so, again, I would renew our requests that the

5     Court direct that that video be extracted from that phone,

6     either by a neutral third party or in some mechanism.

7          And, of course, we object to their counter motion,

8     which is that we have to turn over what's in his brain, his

9     password, and give up the entire contents of the phone, which I

12:18 10     think is completely in violation of the Fifth Amendment.

11          MR. PANICH:  So two points, Your Honor.

12          First, I think the testimony is pretty clear that the

13     phone stayed in the car.  And so whatever happened outside the

14     car, I don't think is going to be within the view of the video.

15     And, I mean, I understand Mr. Kelly's point that it still may

16     have picked up audio from -- but I just, for context, we are

17     talking about a phone that's in the driver's seat area of the

18     console and a discussion, pat frisks that are happening at the

19     back of the car.

12:18 20          THE COURT:  Well, there was an earlier issue of the

21     Miranda.

22          MR. PANICH:  So I don't specifically recall what

23     Detective Gonzalez said in terms of the sequence of events.  My

24     understanding was --

25          THE COURT:  He said he went to the door; he opened the

1   door; and he read the Miranda.

2         MR. PANICH:  And I think he turned the phone on after.

3         THE COURT:  That was today's testimony, as I

4   understand it.

5         MR. PANICH:  But in terms of when the phone was

6   activated, I was under the impression it was after.  But,

7   again, I may be mistaken about that.

8         THE COURT:  Well, the government, as I understand it,

9   is insisting that only the FBI can open this.  It's a secret

12:19 10   place that the defendant can't even attend and watch.

11         MR. PANICH:  It's our position, Your Honor, that only

12   the Government can execute a search warrant, and a vendor

13   cannot execute a search warrant.

14         THE COURT:  The Government hires people all the time

15   to do this sort of thing.

16         MR. KELLY:  A vendor can certainly execute a court

17   order.

18         THE COURT:  Hold it, Mr. Kelly.  At the moment I'm

19   with you.  I mean, it seems to me that the defendant has

12:19 20   certain rights.  He clearly has rights that prevent you at the

21   moment from looking at the thing.  Both of you want to look at

22   it.  So it behooves counsel to work out a mechanism whereby

23   both parties can be privy to the examination of the opening of

24   this cell phone.

25         MR. PANICH:  And I know that I've made this point

1    before, Your Honor, so I apologize for repeating myself, but

2    our position is that the video can be accessed if he inputs his

3    password outside the view of the Government, which the Court

4    has the power to order, and that accomplishes the same thing.

5          We then -- the FBI images the phone after he inputs

6    the password.  We don't know what the password is, so it avoids

7    the Fifth Amendment issue, but you can issue that order under

8    the All Writs Act.

9          THE COURT:  I don't quite understand.  You want him to

12:20 10   give you the password --

11          MR. PANICH:  No, Your Honor.

12          THE COURT:  -- and then trust --

13          MR. PANICH:  No, Your Honor.  I don't want him to give

14   me the password.  I want him to input the password outside our

15   view so we can't see what the password is.

16          THE COURT:  Give it to whom?

17          MR. PANICH:  Back to the FBI so they can image it.

18          THE COURT:  But that's you -- I mean, that's all the

19   government.

12:21 20          MR. PANICH:  I don't think there's a problem with

21   constitutionally --

22          THE COURT:  The problem is that people don't all trust

23   the government, especially now.

24          MR. PANICH:  I certainly can't endorse that position,

25   Your Honor.

1          THE COURT:  I'm not saying what I think.  But I don't

2    understand why the password can't be given to an independent

3    person who is neither Government nor defendant and who is sworn

4    to secrecy.

5          MR. PANICH:  So I think the Government has made its

6    position clear.  We understand.  You will order what you will

7    order, but we can't agree to that.

8          THE COURT:  You cannot what?

9          MR. PANICH:  We cannot agree to take that approach.

12:21 10          THE COURT:  But I can order it?

11          MR. PANICH:  I don't believe that that's the right

12    decision here, but we understand that that's what you may do.

13          THE COURT:  What if the government were to choose an

14    independent person, not a member of the FBI?

15          MR. PANICH:  Your Honor, I am sorry, but I can't agree

16    to that procedure.  We will -- we respect the fact that --

17          THE COURT:  If I order it?

18          MR. PANICH:  Well --

19          THE COURT:  I'll order it to be done by an independent

12:22 20    person, and that person can be chosen by the Government but

21    can't be an FBI agent.

22          MR. PANICH:  And I understand that you may order that.

23    All I'm saying is we're not going to consent with it.

24          THE COURT:  You won't carry it out?

25          MR. PANICH:  No, no, I'm not saying that.  We may

1    explore further appellate options.  I'm just saying we are not

2    going to concede that that's legally appropriate so that -- to

3    avoid the issue.

4            THE COURT:  So the only solution is the one the

5    government wants, that the FBI looks at it?

6            MR. PANICH:  From our -- I think what I've laid

7    out --

8            THE COURT:  What kind of security can you give to the

9    defendant that that's where it's going to stay; it doesn't go

12:22 10   to the U.S. Attorney's Office?

11           MR. PANICH:  Well --

12           THE COURT:  At least until such time as in the regular

13   course of the trial it gets there?

14           MR. PANICH:  If that is what Your Honor wants to

15   order, I am going to comply with the court order unless we seek

16   appellate review.  I'm not going to sit here and tell you that

17   I'm not going to comply with the court order.  I'm saying we

18   are going to comply with the order --

19           THE COURT:  I'm desperately trying to find an

12:23 20   in-between where the government doesn't insist that only the

21   government gets to look at this thing, at the results of this

22   cell phone recording or not.

23           MR. PANICH:  I understand, Your Honor.

24           THE COURT:  Do you really want us to trust the

25   government?

```
 1              MR. PANICH:  Well, the government executes search

 2    warrants every day.  And so, yes, I would.

 3              THE COURT:  What's going to prevent the press release

 4    from being held to tell us all about what the contents of this

 5    iPhone are?

 6              MR. PANICH:  Your Honor, as you're well aware, there

 7    is a local Rule 83.2A, I think, that deals with what the United

 8    States -- what any parties to litigation can say about a

 9    pending litigation.  We have every intention of complying with

10    that order.

11              THE COURT:  I have no doubt that you will.

12              MR. PANICH:  I'm sorry?

13              THE COURT:  I have no doubt that you will, you

14    personally.

15              MR. KELLY:  Your Honor, may I be heard briefly?

16              THE COURT:  Yes.

17              MR. KELLY:  And, again, with respect to the phone, my

18    position is, as I've stated in writing and otherwise, that I

19    just think the Court ought to have the best evidence of what

20    took place, and there's nothing better than having an actual

21    video recording.  And they do it all the time when they do drug

22    cases so...

23              But they can't compel the contents of his brain,

24    whether it's, you know, to secretly give somebody the password.

25    I mean, that's a clear violation of the Fifth Amendment.
```

1      But with respect to this motion to suppress, Your

2  Honor, we have three basic arguments.

3      One, that there was no reasonable suspicion to justify

4  this stop.  What do they base the stop of the car on?  They

5  base it on the fact that this was allegedly a high crime area.

6  They base it on the fact that when they ran the search, this

7  Detective Gonzalez found out that this rental car company

8  rented to drug dealers and some allegations about furtive

9  gestures or suspicious movements within a car.

12:25 10      I suggest to Your Honor that the evidence is that this

11  was a residential area bounded on one side by a set of train

12  tracks.  It was not some run-down area.  The rental car company

13  is a legitimate, currently operating, functioning rental car

14  company that rents cars to all kinds of people.  And they don't

15  ask people whether they are involved in bad things.

16      Their allegations of seeing furtive gestures in the

17  car, I think lack credibility.  I mean, you know, looking

18  through the rear of that vehicle's window, you can't see -- you

19  might be able to see a set of eyes in a rearview mirror.

12:26 20      There's nothing suspicious about a driver -- put

21  yourself in the position of this particular driver, a car with

22  two guys in it, you know, races by him a couple of times

23  looking at him.  He doesn't know if they are gang members, bad

24  guys, police officers.  He doesn't know what they are.

25      They come racing up behind him, you know, before this

bridge.  And anybody would look in the rearview mirror to
figure out what's happening behind him.

He hadn't violated any traffic laws.  And there was
frankly no reasonable basis to stop the car in the first
instance.

Second argument, they had no reason to believe that he
was armed and dangerous.  They conducted multiple pat frisks.
They found nothing which resembled a weapon, whether a gun or a
knife.  What do they say?  They say at some point, either the
second or third pat frisk, they find some weird, out-of-place
object in his groin area.  And at that point, it's no longer a
pat frisk.  He hasn't been placed under arrest.  It's a
full-blown search of his underwear, which you can only do in
two contexts:  One, he's been arrested and you can search him
incident to arrest, or you get a search warrant.  You can't
just reach into somebody's underwear on the side of the street
after you stop the motor vehicle.

There was no basis for suspicion of armed and
dangerous.  And even if it was, it had been dispelled by the
two or three pat frisks that had already been conducted.  He
was cooperative and polite and civil to the officers at the
scene.

Finally, Your Honor, with respect to the Miranda
warnings, I don't buy for a moment that any police officer,
whether you've been on the force for four years or 25 years,

1    that the first thing that you do when you walk up to a car that

2    has the windows closed and doors shut and locked that you read

3    somebody his Miranda rights.  It's completely illogical that

4    anybody would do that.  I think it's a fabrication that they

5    provided Miranda warnings before they did or said anything

6    else.  It makes no sense.  And, in addition, after they

7    place --

8              THE COURT:  If the phone was on, we would hear it.

9              MR. KELLY:  If the phone was on, you would hear it and

12:28  10    you could see it.  I believe what the phone would show, Your

11    Honor, is that they -- you know, of course, Detective Gonzalez

12    says they pull up and parallel park, and his partner says they

13    did what I suggested they did, which is they cut across the

14    front at an angle.

15              They come running back to the car.  They say, "Shut

16    your car off."  I'm sure it wasn't super polite.

17              He puts his hands up like this and says, "What's going

18    on?  Don't shoot me.  I want to turn on my phone for my safety

19    and yours," and he starts recording.

12:28  20              And it would tell us whether or not they provided

21    Miranda warnings through a closed window or not.  I think it's

22    ridiculous that they would do such a thing.

23              And then, finally, after they arrest him, formally

24    arrest him, there's no indication that they provided him with

25    Miranda warnings.  They don't say they Mirandized him again.

1           The first time he gets Mirandized is when he gets

2       asked by this Special Agent Weidlich, "Have you been read your

3       rights?"  He claims he didn't respond.

4           I suggest that may not be exactly right, but he

5       provides him with his rights in the van for the first time.

6       Everything that precedes this is just not credible, Your Honor.

7       It just makes no sense.

8           And, of course, they altered the sequencing of those

9       things because they recognize after the fact that if they don't

12:29 10    have Miranda warnings at some point, they kind of lose all of

11      their probable cause to do the searches, and everything falls

12      apart.  But that's what happened here.

13          So our claim is there was no basis to stop.  They went

14      well beyond what's permissible by way of a pat frisk, and the

15      claim of having given Miranda warnings from the outset is

16      laughable.  It didn't happen.  And there's a clear Fifth

17      Amendment violation, Your Honor.

18          And for all those reasons, I believe the Court should

19      seriously consider granting the motion.

12:30 20        THE COURT:  I have another idea about the cell phone.

21      How would it be -- would the government be amenable to having

22      Mr. Jimenez go to the expert at the FBI?  He opens the phone in

23      the presence but not in view of the FBI agent; the FBI agent

24      does whatever extraction he makes and gives the phone -- I

25      guess you are entitled to the phone, but then it gets locked up

1    again, and the FBI has a locked-up phone.  Is that something

2    that could work?

3           MR. KELLY:  We could work with that, Your Honor.

4           MR. PANICH:  I want to make sure I understand.  So --

5           THE COURT:  That is, the phone is not turned over with

6    a way to open the phone.

7           MR. PANICH:  So it is --

8           THE COURT:  It is opened by the defendant in the

9    presence of the FBI agent and then closed in the presence of --

12:30 10    by the defendant so that it can't be used again unless you in

11    some way break it down the line.

12           MR. PANICH:  So if I understand Your Honor correctly,

13    and I'm with you, I think.  But he opens the phone; the video

14    is extracted, and only the video; and then the phone is locked?

15           THE COURT:  Right.  I don't know whether it's video

16    and audio, as well.

17           MR. PANICH:  It's one component.

18           THE COURT:  Whatever, the event -- the recording of

19    the event is disclosed.  Phone is locked again by the defendant

12:31 20    but in the custody of the U.S. Attorney's Office or the FBI who

21    have a right to have it, having taken it, unless, of course,

22    the entire issue -- the entire proceeding is improper, as

23    Mr. Kelly suggests.

24           MR. PANICH:  So without getting -- so I think that

25    might be okay.  What I would suggest is for -- give me an

 1   opportunity to confer with the cybercrime folks of which I

 2   spoke last time, and we can work with Mr. Kelly to do that, if

 3   that's what we agree on.

 4            THE COURT:  Mr. Kelly, is that agreeable to you?

 5            MR. KELLY:  It is, as long as we're talking about

 6   extracting just the piece that we're looking for, the video?

 7            THE COURT:  Yeah.

 8            MR. KELLY:  Absolutely we can work with that, Your

 9   Honor.

12:32 10          MR. PANICH:  And to avoid responding to everything

11   Mr. Kelly said, because I promised I wouldn't, I would just

12   point Your Honor to the brief which I think does that.

13            THE COURT:  Okay.  So I will take the papers on the

14   motion to suppress.  I will ask Counsel to work out the

15   mechanism for viewing this.  And I guess there may be stuff on

16   the cell phone that is relevant to the motion that I now have

17   to decide, correct?

18            MR. PANICH:  I believe so.

19            THE COURT:  I think it would be helpful, Mr. Panich,

12:32 20   if you could get us a reasonably quick answer.  Let us know how

21   long it will take to do this; and for counsel, both of you, to

22   decide whether any piece of it is appropriate for me to see in

23   conjunction with this motion.

24            MR. PANICH:  So --

25            THE COURT:  That is, with a motion to suppress.

1          MR. PANICH:  I'm confident, Your Honor, we can do that

2      very quickly.

3          THE COURT:  Okay.  So maybe -- let's see -- maybe by

4      the end of next week or maybe even at the end of this week you

5      can tell me whether it's feasible, and then give me a date as

6      to when something would be available that you might want to

7      submit to the Court.

8          MR. PANICH:  I think that's imminently reasonable,

9      Your Honor.

12:33  10          THE COURT:  Okay.  Agreeable?

11          MR. KELLY:  Yes, it's agreeable, Your Honor.

12          THE COURT:  We've got a solution.  Thank you.

13          MR. PANICH:  Thank you very much.

14          MR. KELLY:  Thank you, Your Honor.

15          THE COURT:  And we are in recess until 2:00.

16          (Adjourned, 12:33 p.m.)

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Linda Walsh, Registered Professional Reporter

4     and Certified Realtime Reporter, in and for the United States

5     District Court for the District of Massachusetts, do hereby

6     certify that the foregoing transcript is a true and correct

7     transcript of the stenographically reported proceedings held in

8     the above-entitled matter, to the best of my skill and ability.

9          Dated this 28th day of May, 2020.

10

11

12          /s/ Linda Walsh

13          Linda Walsh, RPR, CRR

14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25